# EXHIBIT A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF KENTUCKY

NORTHERN DIVISION at COVINGTON

| | |
|---|---|
| INDIANA STATE DISTRICT COUNCIL OF LABORERS AND HOD CARRIERS PENSION AND WELFARE FUND, On Behalf of Itself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> OMNICARE, INC., et al., <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 2:06-cv-00026-WOB<br>**(Consolidated)**<br><br>CLASS ACTION |

[PROPOSED] SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS
OF §11 OF THE SECURITIES ACT OF 1933

590440_1

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ...............................................................................................1

INTRODUCTION ...............................................................................................................2

JURISDICTION AND VENUE ..........................................................................................6

THE PARTIES.....................................................................................................................7

THE DECEMBER 2005 OFFERING .................................................................................8

SUBSTANTIVE ALLEGATIONS ...................................................................................10

     Therapeutic Initiatives .........................................................................................10

     Omnicare's Contractual Arrangements With Pharmaceutical Manufacturers..................18

     Legal Compliance ................................................................................................37

OMNICARE'S CONDUCT RENDERED THE FINANCIAL STATEMENTS IN THE
     REGISTRATION STATEMENT FALSE AND MISLEADING....................................41

     Omnicare Improperly Recognized Revenue from Medicaid Reimbursements for
          Drugs Purchased from Johnson & Johnson ..........................................................42

     Omnicare Improperly Recognized Revenues from Fees, Rebates and Discounts
          from Johnson & Johnson and Other Drug Manufacturers ....................................47

     Omnicare Improperly Recognized Revenues from Drug Switching ................................50

     Omnicare's Cash Payments to MMS and Other Nursing Home Operators
          Constituted Round-tripping, Resulting in Overstated Revenues ..........................51

     The Prospectus Misrepresented Omnicare's Collection Practices and Doubtful
          Accounts and Valuation of Receivables ...............................................................60

     Omnicare's Failure to Disclose Risks and Uncertainties...................................................68

     Omnicare's Misstatements Were Material...........................................................................70

     Omnicare's Sarbanes-Oxley Certifications Were False and Misleading............................71

THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS
     CAUTION DOCTRINE ..................................................................................................74

CLASS ACTION ALLEGATIONS ..................................................................................74

**Page**

PRAYER FOR RELIEF ...............................................................................................................77

## NATURE OF THE ACTION

1.      Lead Plaintiff Laborers District Council Construction Industry Pension Fund and named plaintiff Cement Masons Local 526 Combined Funds bring this securities class action on behalf of themselves and all persons who purchased the publicly traded securities of Omnicare, Inc. ("Omnicare" or the "Company") pursuant or traceable to a false Registration Statement and Prospectus issued in connection with Omnicare's public offering of 12,825,000 shares on or about December 15, 2005 (the "December 2005 Offering" or "Offering").[1]  This action asserts violations of §11 of the Securities Act of 1933 ("Securities Act") against Omnicare and its senior insiders, Joel F. Gemunder ("Gemunder"), David W. Froesel, Jr. ("Froesel"), Cheryl D. Hodges ("Hodges"), Edward L. Hutton ("Hutton") and Sandra E. Laney ("Laney").

2.      Omnicare is the nation's largest provider of pharmaceutical care for the elderly.  The Company operates in two business segments, Pharmacy Services and Contract Research Organization Services.  This complaint arises out of Omnicare's Pharmacy Services, the Company's core business which generated approximately $5.1 billion in revenue in 2005, or 97% of the Company's total of $5.3 billion in revenue for that year.

3.      As part of its Pharmacy Services Division, Omnicare provides consultant pharmacy services in Long Term Care Facilities ("LTCFs"), ostensibly to assist LTCFs with evaluating monthly patient drug therapy, monitoring drug distribution, complying with state and federal law and implementing clinical and health management programs.  In order to do so, Omnicare maintains an extensive network of pharmacy consultants who provided on-site pharmacy consulting services to

---

[1]      At the same time, Omnicare also raised $750 million of senior subordinated notes and $977.5 million of convertible senior debentures.

- 1 -

LTCFs.  By 2005, the Company was serving approximately 1,452,000 LTCF patients in thousands

of facilities throughout the United States.

### INTRODUCTION

> The pride of medicine as a profession has always been its freedom from the taint of
> barter and trade in the sick patient.  Physicians must give their wholehearted devotion
> to the care of the patient; no other objective must be given precedence over
> considerations of the patient's need.

"Rebates, Kickbacks, Commissions and Medical Ethics," *Journal of the American Medical*

*Association*, 136(3):176-177 (1948).

4.      From 2000 (and prior), until the time of the December 2005 Offering, "barter and

trade" in the captive population of elderly LTCF residents was Omnicare's *modus operandi* to

achieve its revenue and profit goals.  The more than 1.4 million aged and ailing LTCF residents who

relied on Omnicare for their pharmaceutical needs were but an afterthought in the Company's plan to

drive sales of high-profit drugs.  Pursuant to internal assessments of drug-profitability, Omnicare

utilized its pharmacy services to engage in extensive therapeutic interchange programs designed to

market and sell high-profit drugs to LTCF patients.[2]  Omnicare often implemented such initiatives in

order to effect kickback arrangements with pharmaceutical manufacturers, whereby the Company

received rebates in exchange for promoting the manufacturers' drugs.

5.      The Company's profit-driven therapeutic interchange practices are detailed in

numerous complaints filed by former Omnicare employees who blew the whistle on Omnicare.  *See*

---

[2]      Therapeutic "initiatives," "interchanges" and "interventions" are used interchangeably and
are also referred to as "clinical" or "health management" initiatives designed to steer physicians and
patients towards specific drugs.

- 2 -

Exs. 1-3.[3]  The conduct alleged by the relators is corroborated by confidential witnesses as well as the United States Department of Justice ("DOJ"), which investigated the relators' claims and found that Omnicare had indeed "solicited and received kickbacks from pharmaceutical manufacturers to recommend the use of their drugs to elderly patients in nursing homes, including powerful antipsychotic drugs used to control their behavior."  Ex. 4 (Tony West, Assistant Attorney General for the Civil Division of the DOJ).  *See also* Ex. 5.

6.      A complaint filed against Johnson & Johnson ("J&J") by the United States Attorney's Office in the District of Massachusetts and the DOJ on behalf of the United States Department of Health and Human Services ("HHS") demonstrates Omnicare's role in illegally promoting J&J drugs in violation of the Federal Anti-Kickback Statute.  Ex. 6.[4]  The U.S. J&J complaint contains previously undisclosed internal Omnicare and J&J corporate documents, revealing striking details of Omnicare's illegal promotion of J&J drugs in exchange for kickbacks.  Another complaint filed against Omnicare and numerous pharmaceutical manufacturers by the U.S. and several states reveals the depth of Omnicare's kickback scheme, which extended to many other drug manufacturers in addition to J&J.  Ex. 1.  Omnicare's schemes to promote pharmaceutical manufacturers' drugs were approved and implemented at Omnicare's highest levels of management.  *See, e.g.*, Ex. 7 at JNJ298613 (Defendant and Chief Executive Officer ("CEO") Gemunder advised J&J that Omnicare would continue to implement the Risperdal Initiative to promote the J&J drug).

---

[3]      *Kammerer v. Omnicare, Inc.*, No. 05-11518-RGS (D. Mass. Dec. 5, 2008); *Maguire v. Omnicare, Inc.*, No. 02-cv-11436-RGS (D. Mass. June 21, 2005); *Lisitza v. Omnicare, Inc.*, No. 01 C 7433 (N.D. Ill. Jan. 23, 2003).  An exhibit index is attached before Exhibit 1.

[4]      *United States of America, ex rel. Lisitza and Kammerer v. Johnson & Johnson*, No. 07-10288-RGS (D. Mass. Jan. 15, 2010).

7.     The documents unsealed in the U.S. action against J&J demonstrate that Omnicare, at the pharmaceutical manufacturer's urging, also conducted therapeutic initiatives that targeted drugs, including Risperdal, for off-label use, or uses unapproved by the Food and Drug Administration ("FDA"). *Id.*; Ex. 6. In order to obtain FDA approval for a drug, a manufacturer must provide clinical evaluations of the drug's safety and efficacy for the indicated use. The FDA strictly forbids manufacturers from advertising that a drug is safe and effective for unapproved uses or unapproved patient populations. Such marketing is referred to as "off-label" marketing. As to Risperdal, J&J's Janssen division obtained FDA approval for Risperdal only to treat schizophrenia and the FDA specifically rejected the drug for the treatment of elderly patients with dementia. This denial notwithstanding, Omnicare and J&J jointly developed initiatives pursuant to their illegal kickback arrangements to push Risperdal on nursing home patients with dementia. Exs. 8 at JNJ001100; 9 at OMNI-MA035232; 10 at JNJ001036; 11 at JNJ301399. As predicted by the FDA denial of Risperdal to treat the elderly, Omnicare's off-label promotion of Risperdal was linked to increased incidence of cerebrovascular adverse events, including stroke and even death.

8.     Omnicare further violated the Federal Anti-Kickback Statute by paying tens of millions of dollars to LTCFs in order to obtain or maintain pharmacy services contracts with Omnicare. Exs. 12-13.[5] Contracts for pharmacy services provided Omnicare with its primary vehicle to elicit kickbacks from pharmaceutical manufacturers and drive sales of high-profit drugs. More whistleblower actions filed against Omnicare detail the Company's willingness to violate the law in order to secure these contracts. For example, in 2004, Omnicare was threatened with the loss

---

[5]     *United States of America, ex rel. Resnick v. Omnicare, Inc.*, No. 06-cv-10149-RGS (D. Mass. Mar. 4, 2009); *United States of America and the States of Florida and Illinois, ex rel. v. Omnicare, Inc.*, No. 07-C-5777 (N.D. Ill. Dec. 21, 2010).

of its pharmacy service contracts with Mariner Health Care ("Mariner") nursing homes, which generated approximately $150 million in revenue per year.  In order to salvage its Mariner contracts, the Company agreed to enter into sham acquisitions that resulted in Omnicare's payment of nearly $50 million in kickbacks and caused the Company to overstate revenue and operating income on its income statement and the goodwill asset on its balance sheet.  *See* Ex. 12.  In the same year, Omnicare entered into a similar transaction with Total Pharmacy, which maintained pharmacy services contracts with LTCFs controlled by the father of one of Total Pharmacy's owners.  Omnicare acquired Total Pharmacy and paid kickbacks to one of its owners for arranging to extend the duration of the pharmacy services contracts with Omnicare from one to ten years.  As a result, Omnicare overstated its revenue and operating income by the additional amount of the payments it made to the owners of Total Pharmacy to acquire the nursing homes' business.  *See* Ex. 13.

9.      The Company maintained equally dubious practices with regard to its doubtful accounts receivable – practices that were also linked to illicit revenue generation.  In essence, Omnicare not only failed to write-off uncollectible accounts, many of which were six months or more past-due, but also refused to collect on certain past-due accounts because it had collaborated with the LTCFs to ignore certain charges in exchange for the LTCFs' agreement to prescribe more drugs than necessary to treat its patients, thereby enabling Omnicare to overbill Medicaid and book even more revenue that it was not entitled to record.

10.      At the time of the December 2005 Offering, investors remained wholly unaware of the Company's practices.  Concealing the profit-driven nature of its therapeutic initiatives, defendants falsely advised investors that Omnicare was dedicated to improving the quality of resident care and that its therapeutic interchanges were meant to "***provide [patients with] . . . more***

- 5 -

*efficacious and/or safer drugs than those presently being prescribed*."[6]  Rather than disclose its kickback arrangements with pharmaceutical manufacturers, defendants provided false assurances to investors that Omnicare's contracts with manufacturers were "*legally and economically valid arrangements that bring value to the healthcare system and the patients that we serve*."  These and other statements contained the Registration Statement and Prospectus were materially false and misleading and failed to apprise investors of the true nature of Omnicare's business.

11.     As a result of the aforementioned conduct Omnicare grossly overbilled Medicaid and Medicare in violation of the False Claims Act, 31 U.S.C. §3729.[7]  Accordingly, the Registration Statement and Prospectus contained materially false financial information, overstating revenue and misstating other financial metrics by millions of dollars.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to §11 of the Securities Act, 15 U.S.C. §§77k.

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the Securities Act.

14.     Venue is proper in this District pursuant to §22 of the Securities Act.  The false and misleading Registration Statement and Prospectus was issued from this District.  Omnicare's

---

[6]     Here, as elsewhere, emphasis has been added unless otherwise noted.

[7]     Omnicare delivers pharmaceuticals and other services to patients in LTCFs and requests reimbursement for those drugs and services from Medicaid, Medicare and other insurers.  Between 2000 and 2005, Medicaid and Medicare reimbursements constituted 46%-50% of Omnicare's payor mix.  Accordingly, Omnicare received approximately half of its revenue directly from these government sources, increasing from $1 billion in 2000 to nearly $2.5 billion in 2005.

- 6 -

executive officers are located in Covington, Kentucky, where the day-to-day operations of the Company are directed and managed.

## THE PARTIES

15.    Plaintiff Laborers District Council Construction Industry Pension Fund purchased 1,210 shares of Omnicare common stock at $59.72 per share on December 12, 2005 in Omnicare's Offering, as set forth in the Certification filed with the Court on October 31, 2006 (Doc. No. 35).

16.    Plaintiff Cement Masons Local 526 Combined Funds purchased 790 shares of Omnicare common stock at $59.72 per share on December 12, 2005 in Omnicare's Offering, as set forth in the Certification filed with the Court on April 3, 2006 (Doc. No. 16).

17.    Defendant Omnicare provides pharmaceutical care for elderly people in the United States and Canada.  The Company operates through two segments, Pharmacy Services and Contract Research Organization Services.  Omnicare's securities traded in an efficient market on the New York Stock Exchange ("NYSE") under the symbol OCR.

18.    Defendant Gemunder was, at all relevant times, CEO, President and a director of Omnicare.  Gemunder directed the Company in selling more than $2.5 billion worth of Omnicare securities pursuant to the Offering, including the stock offering at issue.  Defendant Gemunder prepared and signed the false and misleading Registration Statement and Prospectus, the FY 2004 Form 10-K and all 2005 interim financial reports.

19.    Defendant Froesel was, at all relevant times, Chief Financial Officer ("CFO") and Senior Vice President of Omnicare.  Froesel assisted the Company in selling more than $2.5 billion worth of Omnicare securities pursuant to the Offering, including the stock offering at issue.  Defendant Froesel prepared and signed the false and misleading Registration Statement and Prospectus, the FY 2004 Form 10-K and all 2005 interim financial reports.

- 7 -

20.     Defendant Hodges was, at all relevant times, Secretary and Senior Vice President of Omnicare.  Hodges assisted the Company in selling more than $2.5 billion worth of Omnicare securities pursuant to the Offering, including the stock offering at issue.  Defendant Hodges prepared and signed the false and misleading Registration Statement and Prospectus, the FY 2004 Form 10-K and all 2005 interim financial reports.

21.     Defendant Hutton was, at all relevant times, Chairman of the Board of Omnicare.  Hutton assisted the Company in selling more than $2.5 billion worth of Omnicare securities pursuant to the Offering, including the stock offering at issue.  Defendant Hutton prepared and signed the false and misleading Registration Statement and Prospectus, the FY 2004 Form 10-K and all 2005 interim financial reports.

22.     Defendant Laney was, at all relevant times, a director of Omnicare.  Laney assisted the Company in selling more than $2.5 billion worth of Omnicare securities pursuant to the Offering, including the stock offering at issue.  Defendant Laney prepared and signed the false and misleading Registration Statement and Prospectus, the FY 2004 Form 10-K and all 2005 interim financial reports.

**THE DECEMBER 2005 OFFERING**

23.     On December 15, 2005, Omnicare completed a public offering of 12.8 million shares of common stock at $59.47 per share, raising more than $765 million in proceeds via a Registration Statement and Prospectus declared effective with the Securities and Exchange Commission ("SEC") on December 14, 2005 on Form 424B5 (the "Registration Statement").  The Offering was initially registered with the SEC on Form S-3 filed on or about August 17, 2005, later amended on November 23, 2005 (S-3/A) as Amendment No. 1.

24.     The Registration Statement contained summary consolidated financial information for 2002, 2003 and 2004 as well as for the nine months ended September 30, 2005 and incorporated certain financial statements as follows:

> We have elected to "incorporate by reference" certain information into this prospectus supplement.  By incorporating by reference, we can disclose important information to you by referring you to another document we have filed separately with the SEC.  The information incorporated by reference is deemed to be part of this prospectus supplement, except for information incorporated by reference that is superseded by information contained in any document we subsequently file with the SEC that is incorporated or deemed to be incorporated by reference in this prospectus.  Likewise, any statement in this prospectus supplement or any document which is incorporated or deemed to be incorporated by reference herein will be deemed to have been modified or superseded to the extent that any statement contained in any document that we subsequently file with the SEC that is incorporated or deemed to be incorporated by reference herein modifies or supersedes that statement.  We are incorporating by reference the following documents that we have previously filed with the SEC (other than information in such documents that is deemed not to be filed):

> (a)     Omnicare, Inc.'s Annual Report on Form 10-K for the fiscal year ended December 31, 2004, filed March 16, 2005 including the portions of our proxy statement and related supplement incorporated by reference therein;[8]

> (b)     Omnicare, Inc.'s Quarterly Reports on Form 10-Q for the fiscal quarters ended March 31, 2005 and June 30, 2005, filed May 10, 2005 and August 9, 2005, respectively, and Form 10-Q/A for the fiscal quarter ended September 30, 2005, filed November 23, 2005;

> (c)     Omnicare, Inc.'s Current Reports on Form 8-K and Form 8-K/A, as applicable, filed March 9, 2005, March 29, 2005, May 20, 2005, July 7, 2005, July 8, 2005, July 14, 2005, August 3, 2005, August 11, 2005, October 13, 2005, November 23, 2005, November 23, 2005, November 23, 2005, and December 9, 2005.

25.     On December 15, 2005, the Company issued a press release entitled "Omnicare Completes Offerings of $750 Million of Senior Subordinated Notes, $977.5 Million of Convertible Senior Debentures and 12,825,000 Shares of Common Stock."  The release stated in part:

---

[8]     The Company's 2004 Form 10-K included summary financial information for the years 2000-2004.

Omnicare, Inc. (the "Company") today announced that it has completed its offering of 12,825,000 shares of common stock (not including the underwriters' option to purchase additional shares) at $59.72 per share, and also has completed its offerings of $225 million aggregate principal amount of 6 3/4% senior subordinated notes due 2013, $525 million aggregate principal amount of 6 7/8% senior subordinated notes due 2015 and its offering of $977.5 million aggregate principal amount of 3.25% convertible senior debentures due 2035 (including the exercise in full by the underwriters of their option to purchase additional debentures).

## SUBSTANTIVE ALLEGATIONS

26.     Between 2000 and 2005 (the period covered by the Registration Statement), Omnicare engaged in a host of conduct designed to increase the Company's revenue and profit. Omnicare's conduct, however, also violated numerous state and federal laws and regulations and caused substantial harm to the healthcare system and LTCF patients.  As a result, the Company's 2005 Registration Statement contained materially false and misleading statements and omitted material information that was either required to be stated therein or necessary to make the Registration Statement not misleading.

**Therapeutic Initiatives**

27.     In the Registration Statement, defendants made false and misleading statements and omitted material information concerning Omnicare's therapeutic interchange programs which, unbeknownst to investors, served as a vehicle for defendants to drive sales of high-profit drugs to meet internal revenue and profit goals and/or drive market share for pharmaceutical manufacturers. The Registration Statement stated the following about Omnicare's Pharmacy Services provided to LTCFs:

> *When required and/or specifically requested by the physician or patient, branded drugs are dispensed and generic drugs are substituted in accordance with applicable state and federal laws as requested by the physician or resident.  Subject to physician approval and oversight, and in accordance with our pharmaceutical care guidelines, we also provide for patient-specific therapeutic interchange of more efficacious and/or safer drugs for those presently being prescribed.*

- 10 -

The Registration Statement also specifically discussed Omnicare Pharmacy Consultants' practices concerning drug regimen reviews, stating:

> The services offered by our consultant pharmacists include:
>
> *     *     *
>
> **monthly drug regimen reviews for each resident in the facility to assess the appropriateness and efficacy of drug therapies, including a review of the resident's current medication usage, monitoring drug reactions to other drugs or food, monitoring lab results and recommending alternate therapies, dosing adjustments or discontinuing unnecessary drugs**.

28.    The statements in ¶27 above, were materially false and misleading when made because defendants failed to disclose the true facts, detailed in ¶¶29-45, below, which demonstrate that Omnicare utilized its Pharmacy Consulting Services to: (1) implement therapeutic initiatives designed to increase Omnicare's revenue and profit rather than provide patients with more appropriate, efficacious and/or safer drugs; (2) effect its profit-driven drug-substitution initiatives by providing physicians with false clinical and other data concerning the efficacy, safety or cost of a drug; and (3) switch the form or dosage of patients' drug prescriptions to more profitable drugs even without physician approval.

29.    Between 2000-2005, Omnicare engaged in an extensive campaign to increase revenue and profit by implementing therapeutic initiatives, which were essentially marketing programs designed to switch LTCF patients' prescriptions to high-profit drugs.  Omnicare's practices were motivated by the Company's internal assessments of a particular drug's profitability as well as its contractual arrangements with pharmaceutical manufacturers.   Indeed, one pharmaceutical manufacturer noted that Omnicare's willingness to employ initiatives to promote and steer patients towards specific drugs was "highly motivated based on economics," which depended "less on net costs [to payers], and more on quality of product and 'spread' (their margin)." Ex. 14 at JNJ284630. According to the same manufacturer, Omnicare was able to effect dramatic shifts in utilization

- 11 -

from one drug to another, but "in order to have the Omnicare's of the world drive share that high, it must be financially wor[th] their while."  Ex. 15 at JNJ284585.

30.     Statements made by confidential witnesses and former employees who blew the whistle on Omnicare detail the Company's profit-driven drug-substitution initiatives.  According to these witnesses, Omnicare made ongoing assessments of drugs' profitability and, in order to convince physicians to prescribe the most profitable drugs, prepared false clinical assessments indicating that the most profitable drug was also, conveniently, the cheapest and most efficacious. The Company would then implement therapeutic interchanges to drive sales of high-profit drugs. Omnicare even directed its employees to switch patients' drug prescriptions without physician authorization.

31.     David Kammerer ("Kammerer"), the former Director of Medicaid Reimbursement at Omnicare until 2002 who worked directly with Omnicare's top management, explained that Omnicare made ongoing assessments of the profitability of drugs prescribed to LTCF patients and implemented clinical initiatives designed to push patients from lower-profit to higher-profit drugs. As part of Kammerer's regular job responsibilities, he developed models to determine which drug (*e.g.*, Ranitidine, Axid, Pepcid/Famotidine) and which form of the particular drug (tablet or capsule) was the most profitable for each state in which Omnicare operated.  Ex. 16 at 4-5.[9]  Utilizing this information, Kammerer generated profit forecasts that were based on "how much Omnicare market share could be moved from one drug (or drug form) to another drug (or drug form)."  *Id.* at 5.

---

[9]     Kammerer prepared the models using Omnicare's "dead net" acquisition cost for each drug, which was highly confidential and only available to a select few at Omnicare, including defendant Gemunder, Chief Operating Officer ("COO") Patrick Keefe ("Keefe"), Senior Vice President of Purchasing & Professional Services Tim Bien ("Bien"), and a few people in the purchasing department.  These highly confidential "dead net" costs were never shared with the government, other third parties or with Omnicare pharmacies.  *Id.* at 5.

- 12 -

590440_1

Kammerer developed company-wide and regional forecasts for a specific drug-switching initiative. *Id.* at 4-5. According to Kammerer, if the drug switch would increase Omnicare's profitability, then management, including defendant Joel Gemunder, would approve the initiative and direct its Regional Vice Presidents, Regional Clinical Directors, Operations Managers and Consultant Coordinators to make the switch. Ex. 1 at ¶41; 16 at 3-5.

32.     Kammerer, working directly with Omnicare's top management, was responsible for evaluating and increasing the profitability of Omnicare's clinical initiatives and monitoring pharmacies' compliance with those initiatives. *Id.* Kammerer met up to ten times daily with Bien, a direct report to defendant Gemunder, to discuss profits derived from clinical initiatives as well as pharmacies' compliance with Omnicare initiatives. *Id.* Kammerer also discussed Omnicare's profits and clinical initiatives with defendants Gemunder and Froesel, as well as COO Keefe, who, along with Bien, Kammerer considered to be the top four officers at Omnicare. *Id.* Occasionally, Gemunder even contacted Kammerer at home to discuss these matters. *Id.* It was Bien's responsibility to approve or disapprove clinical initiatives, and Gemunder occasionally participated in the approval process as well. *Id.*

33.     CW1, a former Executive Assistant at Omnicare's Midwest Regional Headquarters in Missouri between 1998 and 2005, stated that Omnicare employed these therapeutic interchanges designed to boost Company revenue at least once or twice per quarter. According to CW1, Froesel held conference calls with all of Omnicare's Regional CFOs ("RCFO") and their delegates (the operations and clinical heads and certain financial support persons on the Regional staff), including CW1, during which Froesel advised the call participants that either the whole Company, a particular region or a particular subsidiary pharmacy, required a revenue boost to make its monthly or quarterly revenue and/or earnings numbers. During these calls, Froesel identified the financial shortfall and

then directed the regional or subsidiary pharmacies to employ a "health management initiative," *i.e.* take steps to gain the required extra revenue by substituting higher priced drugs for the lower priced drugs currently prescribed to patients.  CW1 had access to his/her Region's financial information because CW1 attended monthly managers meetings discussing Regional financials, was responsible for assembling the monthly financial statements prepared by Omnicare's pharmacies in the Midwest Region, and compiled financial presentations for the Corporate Office.  CW1 stated that the Region always had difficulty meeting earnings numbers and "never had any breathing room."

34.     According to CW1, in order to justify the drug-switching initiative, CFO Froesel directed Omnicare's RCFOs to create "clinical case studies" to support the proposition that the target drug was more effective and/or more cost effective than the competing drug currently being prescribed.  The RCFOs then conferred with the Regional Clinical Director to "put the clinical spin" on the drugs identified for substitution, with the goal that the "clinical program would bring the desired price and revenue increase."

35.     In the Midwest Region, the RCFO was Douglas Pepper ("Pepper") and the Regional Clinical Director was Joseph Gruber ("Gruber").  In addition to Pepper and CW1, Mark Price ("Price") and Steve McConnell of the regional operations team participated in the calls with Froesel. According to CW1, after Froesel's call, Pepper and Price would discuss operations aspects of the drug substitution initiative and then confer with Gruber to "put the clinical spin on it."  CW1 worked closely with Gruber when developing the clinical justification for the initiative.

36.     CW1 explained that in order to develop the "clinical spin," the Regional Clinical Officers (Gruber in the Midwest Region) met with the Corporate Clinical Officers, including Lisa Welford ("Welford"), Corporate Director for Clinical Operations who led these drug-substitution

efforts, and Barbara Zarnowitz ("Zarnowitz"), Corporate Chief Clinical Officer.  Both Welford and

Zarnowitz were in charge of developing clinical programs.  *See* Ex. 17 at JNJ351935, 37.

  37.  Once the program, or initiative, had been developed, the Regional Clinical Officers

conferred with their assistants, such as CW1, who were responsible for searching Omnicare's patient

database to identify and locate target patients and compile data about each patient's

attending/prescribing physician, the LTCF in which they reside and the patient's family and medical

information.  Gruber would contact CW1 to compile this information.  After the data was compiled,

Omnicare prepared and sent "therapeutic interchange letters" to physicians, LTCFs, and/or their

families, recommending the target-drug and asserting that it was in the patient's best interest to make

the switch.  According to CW1, the tone and content of the letters was often adapted to the recipient.

For instance, a letter to family might state, "grandma would only have to take one pill instead of

two," while the letters to the LTCF would focus on cost savings, and those to physicians might focus

on the efficacy of the drug, with the intent of making it easy for the doctor to say yes to the

substitution.[10]  Kammerer corroborated this information, stating that Omnicare would advise its

pharmacists and physicians that, for example, drug A had the same or even better efficacy than drug

B, but drug A would save the payor money and decrease Omnicare's costs, when in fact it was not

true. Ex. 1 at ¶¶56, 59.  These clinical case studies and therapeutic interchange letters were created

by Omnicare for the sole purpose of obtaining higher profit margins and were not accompanied by

any independent or valid clinical support for the recommendation.  According to CW1, physicians

---

[10]  CW1 stated that at the time of CW1's departure, Omnicare was in the process of developing
a single letter that could be mass produced electronically by filling in certain information concerning
the specific patient, drug class and particular drug.  CW1 was involved directly with the project to
create this single form letter.

had a high volume of patients and did not have time to perform analyses of different drugs themselves.

38.     According to Kammerer and CW1, therapeutic interchange letters were often utilized in conjunction with authorization forms that would make it easy for the physician to approve the drug-change simply by checking a box or line.  Such communications were called Physician Authorization Letters, or "PALs," requesting that the physician authorize the Omnicare pharmacy to make the recommended drug switch.  Ex. 18.  The PALs, too, would misrepresent the efficacy and/or cost benefits of the target drug.  Ex. 1 at ¶57.  Bernard Lisitza ("Lisitza"), a licensed pharmacist and supervisor in charge of several pharmacists at Omnicare's Jacobs HealthCare between 1992 and 2001, personally investigated the statements made in PALs concerning the cost benefits of drugs and determined that, contrary to those statements, the cost of the proposed drug or dosage switch resulted in greater cost to the payor than did the initial prescription.  Ex. 3 at ¶¶34-35.  CW1 said that, once prepared, the letters were sent out by "blast fax," *i.e.* a bulk faxing sent to all addressees.   At times, Omnicare would even implement the drug switch without physician authorization.  Ex. 1 at ¶57.

39.     Omnicare engaged in these drug switching practices for numerous drugs, including Ranitidine, Celexa, Fluoxetine and Buspirone.  Exs. 16 at 9-10; 19-20.

40.     ***The Ranitidine Initiative***: According to CW1, Kammerer, and Lisitza, Omnicare took on a major drug-switching initiative with respect to the drug Ranitidine – the generic form of the antacid Zantac and the second-most prescribed drug to LTCF patients.  Kammerer, who was responsible for evaluating the profitability of specific initiatives, developed financial spread sheets that demonstrated whether Omnicare's profitability could be increased by switching the form of patients' Ranitidine prescriptions, *i.e.*, from tablets to capsules.  Upon determining that switching

- 16 -

patients from Ranitidine tablets to capsules would yield greater revenue, Omnicare management approved the drug-switching initiative and directed the appropriate personnel to make the switch. Ex. 16 at 5-6. As early as 2000, Omnicare took advantage of the discrepancy in reimbursement rates by systematically instructing its clerical staff to alter physician orders for Ranitidine from tablets to capsules. Ex. 3 at ¶¶5, 25.

41. According to Lisitza, Omnicare's initiative to switch patients' Ranitidine prescriptions from tablet to capsule form, resulted in receipt of two to four times the revenue (more than $10 million in 2000-2001 alone) than the Company was entitled to receive from Ranitidine sales. *Id.* at ¶¶2-5, 30, 55. The price differential stems from the fact that there is a maximum reimbursement price, known as the "Federal Upper Limit,"[11] associated with the frequently prescribed tablet. *Id.* The capsules have no corresponding Federal Upper Limit because they are rarely prescribed and are generally only required for individuals who are intubated and require medication dissolved in a solution to be administered through a nasal tube.[12] *Id.* at ¶¶22-23.

42. According to Lisitza, in order to effect the drug form switch, Omnicare reconfigured its computers to make it virtually impossible for data entry clerks to enter any prescription orders for Ranitidine tablets. *Id.* at ¶¶24-27. Upon receiving tablet prescriptions, Omnicare's data entry clerical personnel simply could not process the orders. *Id.* Omnicare would then instruct its clerical personnel to physically alter the prescriptions to make it appear that physicians had prescribed

---

[11]     The Federal Upper Limit was set by the Health Care Financing Administration, now known as the Center for Medicare & Medicaid Services.

[12]     Ranitidine capsules and tablets are not considered the same medication under federal and state law. A pharmacy cannot unilaterally switch between one form of Ranitidine and another without a physician's express order.

- 17 -

capsules instead of tablets and then enter the false prescription information, requesting capsules instead of tablets, into the order entry system.  *Id.*

43.     The altered order (from tablets to capsules) was also entered on the patients' Physician Order Sheets, which were required to be verified by physicians on a monthly basis pursuant to state regulations.  *Id.*  The verifying physicians, however, failed to notice the change from tablet to capsule and would sign off on the Physician Order Sheets, appearing to approve the change.  *Id.*

44.     According to Kammerer, the Ranitidine tablet-to-capsule switch was also effected through the use of PALs.  Occasionally, the PALs just stated that the form of the prescription would be switched unless the physician actively intervened to stop Omnicare pharmacists from doing so. Ex. 16 at 8-9.  Furthermore, when market conditions changed, making the tablet more profitable than the capsule, Omnicare would send a directive to its pharmacies to revert to the initial prescription, or "turn off the PAL."  *Id.* at 8.  Significantly, according to Kammerer, in most cases, the periodic switches from Ranitidine tablets to Ranitidine capsules were done ***without a new physician prescription authorizing the change***.  *Id.* at 6.

45.     CW1 indicated that during her tenure with the Company, the government began investigating the Ranitidine drug-switching practices at one of the pharmacies in the Midwest Region, prompted by the justifications for the interchange that appeared in the interchange letters. According to CW1, Omnicare's top management viewed the Ranitidine investigation as "big trouble," and an issue that the Corporate Office and Regional Operations were "tight lipped" about.

**Omnicare's Contractual Arrangements With Pharmaceutical Manufacturers**

46.     The Registration Statement also contained the following false and misleading statement concerning Omnicare's contractual arrangements with pharmaceutical manufacturers:

- 18 -

Our contractual relationships with pharmaceutical manufacturers can include rebates and other forms of price concessions on the product we purchase. On November 28, 2005 CMS [Centers for Medicare and Medicaid Services] posted to the "Questions and Answers" portion of its website a statement to the effect that it has significant concerns about the continued payment of certain rebates by pharmaceutical manufacturers to long-term care pharmacies with respect to prescriptions dispensed under the new Medicare Part D prescription drug benefit, and that it is examining this issue closely. *We believe that our contracts with pharmaceutical manufacturers are legally and economically valid arrangements that bring value to the healthcare system and the patients that we serve.* However, there can be no assurance that, if these price concessions were no longer provided to us, there would not be a materially adverse effect on our business or results of operations.

The Registration Statement specifically pointed to the Company's obligation to comply with the

Federal Anti-Kickback Statute and other laws concerning pharmaceutical marketing programs,

stating:

Referral Restrictions. We have to comply with federal and state laws which govern financial and other arrangements between healthcare providers. These laws include the federal anti-kickback statute, which prohibits, among other things, knowingly and willfully soliciting, receiving, offering or paying any remuneration directly or indirectly in return for or to induce the referral of an individual to a person for the furnishing of any item or service for which payment may be made in whole or in part under federal healthcare programs. . . . Violations of these laws may result in fines, imprisonment, denial of payment for services, and exclusion from the federal programs and/or other state-funded programs.

Other provisions in the Social Security Act and in other federal and state laws authorize the imposition of penalties, including criminal and civil fines and exclusions from participation in Medicare, Medicaid and other federal healthcare programs for false claims, improper billing and other offenses.

In addition, a number of states have undertaken enforcement actions against pharmaceutical manufacturers involving pharmaceutical marketing programs, including programs containing incentives to pharmacists to dispense one particular product rather than another. These enforcement actions arose under state consumer protection laws which generally prohibit false advertising, deceptive trade practices, and the like.

*We believe our contract arrangements with other healthcare providers, our pharmaceutical suppliers and our pharmacy practices are in compliance with applicable federal and state laws*. These laws may, however, be interpreted in the future in a manner inconsistent with our interpretation and application.

- 19 -

47.     The statements in ¶46 above, were materially false and misleading when made and failed to disclose the true facts, detailed in ¶¶48-90 below, which demonstrate that, in violation of the Federal Anti-Kickback Statute, Omnicare executed and implemented contracts with pharmaceutical manufacturers whereby the Company promoted and/or increased the market share of manufacturer-specified drugs in exchange for kickbacks.  Additionally, the conduct set forth in ¶¶48-90 below, further renders the statements in ¶27 above, materially false and misleading when made because, pursuant to its contracts with pharmaceutical manufacturers, Omnicare utilized its Pharmacy Consulting Services to: (1) implement therapeutic initiatives designed to increase Omnicare's revenue and profit rather than provide patients with more appropriate, efficacious and/or safer drugs; and (2) promote drugs for off-label use in disregard for patient safety.

48.     During the time period covered by the Registration Statement, Omnicare entered into agreements with numerous pharmaceutical manufacturers concerning the promotion and sale of specific drugs.  Pursuant to these contracts, pharmaceutical manufacturers induced Omnicare to increase the manufacturer's "market share" of a particular drug, where market share referred to Omnicare's purchases of the drug as a percentage of its total purchases of drugs in the same therapeutic category.  The agreements provided for Omnicare's receipt of cash rebates in exchange for increasing the manufacturer's market share for particular drugs.  In other words, the pharmaceutical manufacturers paid Omnicare to purchase and/or recommend the manufacturer's drugs over competing products.  Omnicare's therapeutic initiatives or interchanges, detailed in ¶¶29-39 above, were the primary vehicle for implementing the contracts.[13]

---

[13]     Omnicare took these kickbacks into consideration when evaluating the profitability of its clinical initiatives.  Ex. 16 at 3.  Internal documents reveal that Omnicare would play pharmaceutical manufacturers against one another in an effort to obtain the highest rebate, or greatest profit, possible for pushing drugs in a particular therapeutic category.  *See* Ex. 7 at 1 (Dan Maloney, Vice President

- 20 -

49.     Omnicare's contracts with drug manufacturers, and the initiatives implemented pursuant thereto, violated the Federal Anti-Kickback Statue.  The Federal Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b), prohibits any person or entity from soliciting or receiving payment of any kind, "directly or indirectly, overtly or covertly," for arranging for or recommending the purchase of any good, including pharmaceuticals, that will be paid for by Federally funded health care programs:

> (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –
>
> *     *     *
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined no more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. §1320a-7b(b)(2).[14]

50.     Violation of the Federal Anti-Kickback Statute subjects the violator to exclusion from participation in Federal health care programs, including Medicaid and Medicare.  42 U.S.C. §1320a-7(b)(7).[15]  Additionally, compliance with federal and state laws, including the Federal Anti-Kickback

---

of Contracting, indicating that insufficient offer by Johnson & Johnson would lead him to seek a contract with Bayer).

[14]     The anti-kickback statute arose out of Congressional concern that payoffs made to those who can directly influence health care decisions (such as pharmaceutical consultants in nursing homes) will result in conduct that harms patients and Federally funded healthcare programs, such as prescription of goods and services that are medically unnecessary, of poor quality, or even harmful to the vulnerable patient population.  To protect patients and the integrity of Federal health care programs, including Medicare and Medicaid, the anti-kickback statute strictly prohibits the payment of kickbacks or rebates in exchange for promoting or arranging for the purchase of specific pharmaceuticals, even if the drug recommendation or purchase is medically justifiable.

[15]     Violation can also result in civil monetary penalties and imprisonment of up to five years per violation.  42 U.S.C. §§1320a-7(b)(7), 1320a-7a(a)(7).  The civil monetary penalties may be up to

- 21 -

Statute, is a condition precedent to reimbursement of Medicaid claims under the law of every state, which require Medicaid participants to certify their compliance with state and federal laws and regulations. *See, e.g.*, Fla. Stat. §409.920(2)(a)(5); 305 ILCS 5/8A-3(b), (c); 130 CMR 450.261.

51.     Omnicare's top officers, including defendants Gemunder and Froesel, were intimately involved in negotiations concerning the kickback arrangements and the therapeutic initiatives employed to increase the manufacturer's market share.  Exs. 7 at JNJ298613; 16 at 4; 21 at JNJ011363.  CW1 verified that it was Omnicare's top management in the Corporate Office that was responsible for negotiating contracts with pharmaceutical manufacturers.

52.     Omnicare solicited and received kickbacks from pharmaceutical manufacturers pursuant to various contractual arrangements, including the following:

53.     ***Johnson & Johnson***: The government charges filed against J&J in January 2010 provide the most detailed account of Omnicare's illegal kickback arrangements.  Documents produced in connection with the DOJ complaint demonstrate that Omnicare and J&J signed drug supply agreements in 1997 (the "1997 Agreement") and 2000 (the "2000 Agreement") (collectively, "the Agreements") that covered the period between April 1, 1997 and March 31, 2004 and set forth a mechanism by which J&J would pay Omnicare rebates, or kickbacks, for promoting J&J pharmaceuticals in direct violation of the Federal Anti-Kickback Statute.  Exs. 8; 10; 22.

54.     Pursuant to the Agreements, Omnicare promoted specific J&J pharmaceuticals, known as "strategic products," in an effort to increase their "market share."  Exs. 8 at JNJ001084, 92, 100-03; 10 at JNJ001032, 36-39, 41-42.  Market share increased when Omnicare's purchases of a J&J-specified drug increased as a percentage of the Company's total purchases of drugs in the

---

$50,000 for each act in violation of the anti-kickback statute and damages of up to three times the amount of the remuneration offered or paid.  42 U.S.C. §1320a-7(b).

same therapeutic category.  Exs. 8 at JNJ001092; 10 at JNJ001032.  In turn, J&J paid Omnicare quarterly "market share rebates" – or illegal kickbacks – that were tied directly to the market share Omnicare achieved for a particular strategic drug.  Exs. 8 at JNJ001100-03; 10 at JNJ001041-42. The quarterly rebate was a performance-driven, tiered rebate incentive in exchange for Omnicare to aggressively push and sell J&J drugs in LTCFs.

55.    Omnicare received rebates for increasing the market share of J&J drugs that ranged between 1% and 14% of Omnicare's total purchases of each drug, increasing as the market share for the drug increased.  For example, the 2000 Agreement provided for the following, tiered rebate incentive schedule:

| Product | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 5 | Active Intervention Program Requirements |
|---|---|---|---|---|---|---|---|
| DURAGESIC® | Actual Mkt Share | 55.0% | 60.0% | 65.0% | 70.0% | | See Below |
| | Rebate % | 2.0% | 4.0% | 8.0% | 10.0% | | |
| ACIPHEX™ | Actual Mkt Share | Transition Period (12 months) | <15.0% | ≥15% to 24% | ≤25% to 29% | | See Below |
| | | | | | 10.0% | | |
| | Rebate % | 8.0% | 0.0% | 8.0% | | | |
| PROPULSID™ | Actual Mkt Share | Formulary Access | 20.0% | 25% | 30% | | NONE |
| | Rebate % | 1.5% | 4.0% | 8.0% | 10.0% | | |
| LEVAQUIN® TABLETS | Actual Mkt Share | Transition Period (6 months) | <50% | ≥50% | | | See Below |
| | Rebate % | 6.0% | 0.0% | 15.0% | | | |
| LEVAQUIN® IV | Actual Mkt Share | Transition Period (12 months) | <50% | ≥50% to 70% | >70% | | See Below |
| | Rebate % | 5.0% | 0.0% | 5.0% | 7.0% | | |
| RISPERDAL® | Actual Mkt Share | Transition Period (6 months) | <35% | 35% to 37% | >37% to 42% | >42% | See Below |
| | | | | | 9.0% | | |
| | Rebate % | 5.0% | 0.0% | 6.0% | | 11.0% | |
| ULTRAM® | Actual Mkt Share | Formulary Access | 10.0% | 15.0% | 20.0% | 25.0% | See Below |
| | Rebate % | 1.5% | 3.0% | 4.0% | 6.0% | 8.0% | |
| PROCRIT® | Actual Mkt Share | Formulary Access | | | | | See Below |
| | Rebate % | 2% | | | | | |

56.     In addition to the quarterly market share rebates, Omnicare accepted "performance" rebates from J&J pursuant to the Agreements that also violated the Federal Anti-Kickback Statute. The 1997 Agreement included a 1% "Annual Strategic Product Performance Rebate" and the 2000 Agreement included a 2% "Annual Product Performance Incentive."  Exs. 8 at JNJ001100; 10 at JNJ001035.   Under both provisions, J&J paid Omnicare annual performance rebates for implementing an "Active Intervention Program (AIP)" or "Appropriate Use Program (AUP)" for certain drugs.  The performance rebates violated the Federal Anti-Kickback Statute because the AIP and AUP programs from which the rebates were derived, were specifically designed to "shift market share" to or "cause the appropriate use" of J&J's strategic drugs, as defined in the Agreements:

a)      "Active Intervention Program" shall mean a program, applied by Manager and accepted by Supplier[16] in writing, which is ***designed to appropriately shift market share to Supplier's Product***.  Active interventions can include, but are not limited to, disease management initiatives, written correspondence to Participating Providers prescribing or dispensing pharmaceutical products, educating nursing home staff regarding Supplier's Products, ***conducting clinical intervention programs though which consultant pharmacists recommend Supplier's Products when appropriate***.

b)      "Appropriate Utilization Program" or "AUP" shall mean a program applied by Manager, and accepted in writing by Supplier, ***designed to cause the appropriate use of Supplier's Product(s)***.

Exs. 8 at JNJ001084, 89; 10 at JNJ001031.

57.     Omnicare and J&J jointly developed the AIP/AUP "initiatives" which were intended to increase physicians' prescriptions and thus Omnicare's purchases of J&J drugs.  Ex. 10 at JNJ001036.  Pursuant to the AIP or AUP, Omnicare and J&J designated certain drugs as "Selected," meaning Omnicare and its pharmacy consultants "favored" those drugs over other brands for certain

---

[16]     "Manager" refers to Omnicare and "Supplier" refers to J&J.  Exs. 8 at JNJ001085; 10 at JNJ001028 (footnote added).

clinical indications. *Id*. at JNJ001043. In order to promote and increase the market share of Selected drugs, Omnicare personnel "actively participate[d] in educational and promotional programs discussing [the Selected drugs]" and "work[ed] with [J&J] to implement communication effort to inform attending physicians of" a drug's "favored" status. *Id*. Omnicare even developed scripts to enable its pharmacists to recommend the J&J products. Ex. 23 at OMNI-MA881954-57. Omnicare and J&J met quarterly to discuss the "performance goals" and "progress on the business plan." Ex. 10 at JNJ001036.

58.     In addition to the aforementioned "overt" kickbacks, Omnicare also received "covert" kickbacks designed to circumvent the law. For instance, Omnicare and J&J characterized certain kickbacks as "data fees" or "grants." The kickbacks were generated as a result of Omnicare's and J&J's contractual arrangements, and Omnicare's successful promotion and sale of targeted J&J drugs, but were re-characterized as "data fees" or "grants" to disguise their true purpose.

59.     The re-characterization was prompted by J&J's concern that the kickbacks would set a new "Best Price" for drugs under the Medicaid Drug Rebate Statute, 42 U.S.C. §1296r-8. Under the Medicaid Drug Rebate Statute, pharmaceutical manufacturers are required to advise Medicaid of the "Best Price" associated with a particular drug and pay rebates to Medicaid that increase as the Best Price decreases.[17] By disguising the kickbacks as "data fees" and "grants," Omnicare and J&J sought to evade Best Price detection in violation of the Medicaid Drug Rebate Statute.

---

[17]     Congress enacted the Medicaid Drug Rebate statute, 42 U.S.C. §1396r-8, to ensure that the Medicaid program would receive the benefit of the same discounts and prices on drugs that other large public and private purchasers enjoyed. *See* H.R. Rep. No. 101-881, at 986 (1990), *reprinted in* 1990 U.S.C.A.A.N. 2017, 2108. Under the Medicaid Drug Rebate Statute, in order for a brand name drug to be covered and reimbursed by the Medicaid program, its manufacturer has two primary obligations. First, the manufacturer must report on a quarterly basis to the Secretary of HHS the drug's "average manufacturer price" and the "best price" offered for that drug. 42 U.S.C. §1396r-8(b)(3)(A). Second, the manufacturer must pay each state a quarterly rebate equal to the total

60.     In an attempt to create an air of legitimacy, J&J and Omnicare entered into a "Consulting and Services Agreement," covering the period between July 1, 2000 and April 1, 2004, that set forth terms under which J&J would appear to pay Omnicare for data.  Ex. 24.  J&J and Omnicare agreed that any rebates that would have been received as a result of the promotion and increased market share of J&J drugs, would instead be distributed in the form of "data fees," purportedly for Omnicare's furnishing J&J with market share reports for J&J drugs as well as data identifying physicians who prescribe competing drugs rather than J&J drugs.  Ex. 25.  Notably, prior to entering into the consulting agreement, Omnicare had been providing this same data to J&J free of charge, underscoring the disingenuousness of the "data fees" and elucidating their true nature as kickbacks.

61.     An internal memorandum further exposes the illicit nature of the agreement and demonstrates that Omnicare and J&J entered into the agreement solely to circumvent the law:

1.      Consulting and Services Agreement

a.      Risperdal Rebates have been pushing towards Best Price

b.      To avoid Best Price, the Strategic Overlay for Risperdal (2% of sales) had to be eliminated

c.      In order to balance this, an agreement was established with Omnicare to purchase data, roughly at the cost of the Strategic Overlay for Risperdal

---

number of drug units (*e.g.*, pills) purchased by the state times the greater of (1) 15.1% of the drug's average manufacturer price, or (2) the difference between the average manufacturer price and the best price.  42 U.S.C. §1396r-8(c)(1)(A).  In other words, J&J was required to pay at least a 15.1% rebate to each state on all of its drug sales for Medicaid patients, but J&J would have to pay a higher Medicaid rebate on all of those sales if it offered any single customer, *e.g.*, Omnicare, a total discount that exceeded 15.1 %.  Under the Medicaid Drug Rebate Statute, 42 U.S.C. §1396r-8, drug manufacturers like J&J are supposed to file quarterly reports showing that Medicaid programs got the same rebates as other big purchasers.

- 26 -

Ex. 26.  In a similar fashion, Omnicare and J&J amended the 2000 Agreement to ensure that Omnicare's "overt" kickbacks would not reduce the current Best Price for a given drug.   The amendment stated:

> If at any time during the term of this Agreement the Manager is eligible to receive a discount or rebate, directly or indirectly, for any Product under any contract with Supplier, the combined total of such discount(s) and/or rebate(s) shall be reduced to the extent necessary *so that it does not create a new Medicaid "best price"* for any Product.  In the event the combined total of such discount(s) and or rebate(s) would create a new "best price," a price adjustment shall be made.

Exs. 27 at JNJ002618; 25.

62.     Pursuant to the "Consulting and Services Agreement," Omnicare received $4,650,000 between 3Q00 and 1Q04.  Ex. 24.[18]

63.     The Consulting and Services Agreement violated the Medicaid Drug Rebate Statute by concealing the true "Best Price" for J&J drugs.

64.     Omnicare and J&J also sought to disguise kickbacks paid pursuant to an agreement concerning the J&J drug Sporanox.  Omnicare had increased Sporanox's market share enough to justify a rebate of 25%, setting a new "best price," under the statute.  In order to avoid "Best Price" detection, J&J sought to decrease the contractual rebate to 20% and "make up" for the 5% rebate loss "in another way."  In a July 22, 2002 e-mail, J&J noted:

> We were looking at the cost impact of the Omnicare Sporanox purchases on Janssen business.  Since the 25% rebate on Omnicare Sporanox purchases sets the best price, and the next best price is 20%, the Medicaid cost impact is about $1

---

[18]     Pursuant to the "consulting" agreement, Omnicare and J&J agreed to mischaracterize the rebates as "data fees" from the fourth quarter of 1998, the first quarter of 1999 and the additional rebates from the two percent Annual Produce Performance Incentive (also referred to as a "strategic overlay" for Risperdal that J&J was required to pay under the 2000 Agreement.  The same document also reflects that J&J sent $2.5 million in advance of the regular rebate schedule its 2Q00 rebates in order to assist Omnicare with cash flow issues.  *Id.*; Ex. 27 at JNJ002618.

- 27 -

million per year (avg $200k per % point) for the additional 5%. It may make sense for us approach Omnicare about reducing the rebate to 20%.

*     *     *

I would recommend to try to make up the loss of rebates in another way.

Ex. 28 at JNJ347031-32. The same e-mail indicated that after speaking with Omnicare, Omnicare was open to switching the rebate payment but "[t]hey did not have a good idea of where to switch the $4,000 payment to." *Id*. at JNJ347032

65.     Omnicare and J&J further disguised the kickbacks to Omnicare by characterizing them as "grants," "educational funding," and "meeting sponsorship" fees. An internal J&J memorandum indicated that it had paid Omnicare over $1,000,000 for "educational, pull-through, and social activities," over a two-year period. Ex. 11 at JNJ301391. Indeed, Omnicare's high-level executives would directly request such "educational" funding and specifically note that the funding was to support initiatives to increase the market share of certain drugs. Ex. 29.

66.     In order to effect its agreements with pharmaceutical manufacturers, Omnicare implemented therapeutic initiatives, as described in ¶¶29-39 above. Welford, Director of Clinical Operations, indicated that among the Company's most important initiatives were the Risperdal Initiative and the Levaquin Initiative. Ex. 30 at JNJ291258.

67.     ***The Risperdal Initiative***: Pursuant to the drug supply Agreements between Omnicare and J&J, Omnicare initiated an aggressive campaign known as the "Risperdal Initiative," in which Omnicare directed its Regional Clinical Directors and Consultant Coordinators to push Risperdal on patients in nursing homes beginning in 1997. Exs. 9; 29. Omnicare was incentivized to increase Risperdal's market share because the Company could receive rebates up to 11% for driving the drug's market share above 42%. According to Welford, Risperdal was Omnicare's "primary intervention." Ex. 30 at JNJ291258. In order to effect the campaign, Omnicare developed a Patient

- 28 -

Specific Therapeutic Interchange Protocol, that purported to provide a medical review of Risperdal justifying the drug's recommendation.  Exs. 9; 29.

68.     Omnicare's Risperdal Initiative not only violated the Federal Anti-Kickback Statute, but also assisted J&J in violating federal regulations concerning off-label marketing, including the Food, Drug, and Cosmetic Act, 21 U.S.C. §301, which prohibits drug manufacturers from marketing drugs for indications other than those approved by the U.S. Food and Drug Administration ("FDA"), and the FDA Modernization Act of 1997, which bars drug manufacturers from supplying medical practitioners with off-label information unless such information is specifically solicited by the physician.  21 U.S.C. §260aaa-6.

69.     Risperdal is an atypical antipsychotic medication that, at the time of the Offering, had only been approved by the FDA for the treatment of schizophrenia.  Risperdal has never been approved to treat patients with dementia and dementia-related behavioral issues.  Moreover, the drug was shown to increase the risk of stroke and other cerebrovascular attacks in such patients and even resulted in fatalities among dementia patients.  *See* Ex. 31.  Regardless, because only 1% of the elderly population has schizophrenia, Omnicare and J&J implemented an initiative to promote Risperdal sales to patients suffering from other indications, ***including dementia***, endangering LTCF patients and violating the FDA regulations.  Accordingly, the Patient Specific Therapeutic Interchange Protocol drafted to support the initiative was specifically revised to add "much more emphasis on geriatric behavior use and decreased [sic] the emphasis on schizophrenia."  Ex. 9 at OMNI-MA05232.  This protocol sought to justify Omnicare's use of Risperdal to promote and sell the drug to patients with behavioral disturbances associated with dementia – an indication for which Risperdal was not approved.  *Id*.

70.     According to an internal Omnicare memorandum, as part of its Risperdal Initiative, Omnicare engaged in a "Risperdal Fax Campaign" whereby the Company identified LTCF patients taking conventional antipsychotic drugs and faxed, mailed, or telephoned the physician to recommend a switch to Risperdal therapy.  Ex. 32 at OMNI-MA766303.  According to the memo, the "interchange" was successful and a "significant number of physicians agreed to the conversion." *Id*.  For those physicians who did not automatically convert their patients to Risperdal, Omnicare admonished:

> There must continue to be ongoing communication between consultant pharmacists and those physicians who agreed to re-evaluate.  Consultants should . . . be armed with the appropriate clinical information. . . .  It is imperative that each and every resident on a conventional antipsychotic be re-evaluated for appropriate conversion to an atypical antipsychotic, with Risperdal being the more cost effective GPCG "preferred" alternative.

*Id*. at OMNI-MA766303-04.  Omnicare further directed its pharmacy consultants to continue to evaluate patients who had not been included in the fax campaign for conversion to Risperdal.  *Id*.

71.     Omnicare also implemented the Risperdal initiative by issuing PALs, which requested that the physician pre-authorize pharmacists to substitute Risperdal over a competitor drug when the pharmacist received the prescription.  Ex. 18.  For example, Omnicare pharmacies Jacobs Healthcare and Lawrence Weber, collectively serving almost 30,000 beds, began sending PALs to generate pre-authorized approval of Risperdal in May 2001.  Ex. 33 at JNJ289772.

72.     ***The Levaquin Initiative***: Another one of Omnicare's "primary interventions" was the "Levaquin Initiative," designed to promote the J&J drug and increase its market share with respect to its number one competitor, Cipro.  Ex. 30.  Cipro, a Bayer Pharmaceutical drug, had long been the drug of choice in the antibiotic therapeutic category, with over 70% market share.  Through the Levaquin Initiative, whereby Omnicare and its pharmacy consultants actively favored Levaquin over Cipro and other brand named drugs in the same category, Omnicare was able to increase the market

- 30 -

share for Levaquin from 19.2% in 4Q98 to 66.4% in 2Q01, reducing Cipro from approximately 80% to 28% market share over the same timeframe. Ex. 7. By October 2001, Levaquin surpassed Cipro, reaching over 71% market share. *Id.* To achieve these results, Omnicare sent PALs, or therapeutic interchange letters, to physicians asking for their approval to switch patients to Levaquin. Exs. 33-34. When physicians did not respond, Omnicare pharmacists called physicians, upon receipt of a prescription for Cipro, and requested the conversion to Levaquin. Ex. 33-34.[19]

73.    ***The Success of Omnicare's Interchange Programs***: The success of Omnicare's initiatives was unprecedented, generating greater market share for the pharmaceutical manufacturers and generous kickbacks for the Company. In a PowerPoint presentation in 2000, J&J commended Omnicare for the success of both the Risperdal and Levaquin Initiatives:

**1999 Accomplishments**

- Completed "Risperdal Re-ignition Program" – Generating over a 50% market share.

*     *     *

- Developed Programs for Consultant Pharmacists in Dealing with Obstacles and Overcoming Resistance in Physician Prescribing Habits toward Risperdal.

*     *     *

- Levaquin over 50% Market Share.

Ex. 36 at OMP004128, 31-32.

74.    In another e-mail, J&J again lauded the Company's efforts and success: "Omnicare is the example of what Johnson & Johnson believes to be the gold standard of Pharmacy Providers"

---

[19]    Omnicare's initiatives were not limited to Risperdal and Levaquin alone. It's contractual arrangements with J&J specified that the Company would receive kickbacks for promoting other drugs as well. Exs. 8; 10. Omnicare's initiatives to promote these drugs were successful as well. For example, J&J commended Omnicare for its success in shifting market share to other drugs, such as Ultram, noting that Omnicare had "been able to switch . . . prescriptions to Ultram." Ex. 35.

- 31 -

based on its stellar performance increasing "Risperdal market share in an extremely competitive

market." Ex. 35.  An undated internal memorandum summarizes the success of Omnicare's and

J&J's undisclosed, profit-driven relationship:

> During 1997, The Johnson & Johnson Long Term Care Business Group along with Johnson and Johnson Health Care Systems signed a performance based contract with Omnicare, Inc.  The contract provided for a performance driven tiered rebate to be implemented for Johnson & Johnson strategic brand pharmaceutical products including Ultram, Duragesic, Propulsid, Procrit, Risperdal, Levaquin, and Floxin.

> Currently, Omnicare is running two initiatives for products produced at Janssen and Ortho-McNeil.  Risperdal has generated an all time market share high of 55.5% throughout the 1st quarter of 2000.  This market share represents Omnicare's ability in persuading physicians to write Risperdal in the areas of Behavioral Disturbances associated with Dementia.

> Omnicare also has an initiative under way for the antibiotic Levaquin for Urinary Tract Infections and Community Acquired Pneumonia.  *At the end of the first quarter, Levaquin reached an all time high market share of 67.02%.  Once again, demonstrating Omnicare's ability to persuade* physicians to write the most efficacious medication based on clinical evidence.

> The partnership has grown beyond product interventions.  Omnicare's Clinical Research Organizations have been involved with past clinical studies and offers potential in a geriatric specific environment for products such as Reminyl.

> Janssen and Omnicare have also piloted an e-commerce initiative that would demonstrate *Omnicare's abilities in persuading physicians to write medications in a less structured assisted care living environment*.  There are also meetings currently underway that would look at a partnership approach in the European sector, in addressing the same type of product interventions with Janssen Cilag in England.

> *Omnicare, Inc. has demonstrated its ability to partner in a true sense of the word and has generated well over 100 million dollars of Johnson & Johnson pharmaceuticals annually*.

Ex. 37.

75.     Omnicare and its pharmacy consultants had unbelievable power to influence patients'

drug prescriptions.  As J&J observed in an internal memorandum from 2003:

> Omnicare has over 900 consultant pharmacists who review patient charts monthly and make recommendations based on the formulary and Omnicare programs for physicians. *Pharmacists' recommendations are accepted more than 80% of the*

- 32 -

*time*.  Consultant pharmacists actively meet with physicians or correspond with them through the mail to obtain approval to make appropriate medication switches for all their applicable nursing home patients. . . .   Omnicare consultant pharmacists receive monthly "report cards" showing them their success in obtaining goals for therapeutic programs.

Ex. 17 at JNJ351928.  In the same memorandum, J&J observed that Omnicare's "consultant pharmacists are active in having physicians sign therapeutic interchange forms that allow pharmacists to review charts and make switches without having to consult with the physician." *Id*. at JNJ351940.  J&J further understood that consultant pharmacists had a "[h]igh degree of impact on product selection" in nursing homes.  Ex. 14 at JNJ284630.

76.     Omnicare's pharmacy consultants were so effective at promoting and inducing the sale of targeted pharmaceuticals that it caused one J&J executive to comment, "Incredible: good for us but scary on the power to do this."  Ex. 38.  Indeed, J&J considered Omnicare's consultants an "Extension of [the J&J] Sales Force." Ex. 39 at JNJ289731.

77.     The kickback arrangements between Omnicare and J&J were lucrative for both companies.  Between 1999 and 2004, Omnicare's annual purchases of J&J drugs nearly tripled to almost $300 million, with annual purchases of Risperdal alone rising to over $100 million.  J&J determined that, "for a $3MM investment in rebates with Omnicare, [J&J] gain[s] $9MM in sales, less costs and investments, returns $4.8MM to OMP." Ex. 40 at JNJ351497.  In another internal J&J e-mail, J&J bragged about the success of the kickback scheme between Omnicare and J&J, noting that for every a $1.44 million in "investment in rebates" with Omnicare, J&J gained $9 million in sales. *Id.*

78.     In total, Omnicare obtained many millions of dollars in rebates from J&J.  During 4Q01, the Company also specifically obtained: a 8% rebate for Duragesic purchases, totaling $2,282,609; a 5% rebate for purchases of Ultram, totaling $326,003; a 14% rebate for Ditropan XL purchases, totaling $866,096; a 2% rebate on Topamax purchases, totaling $98,640; a 7% rebate on

- 33 -

Reminyl purchases, totaling $231,897; a 2% rebate on Aciphex purchases, totaling $51,956; and a 2% rebate on Regranex purchases, totaling $50,212. Ex. 1 at ¶46.

79.     ***Abbott Laboratories***: In 4Q01, and in other calendar quarters, Abbott Laboratories ("Abbott Labs") paid Omnicare concealed "discounts" to induce Omnicare to make purchases of Abbott Labs' products and in exchange for Omnicare agreeing to give preferential treatment to these drugs over competitors' drugs. Omnicare ultimately received a 6.0% discount on its total purchases of Flomax and an 88% discount on purchases of K-Tab for taking steps to increase the market share of these drugs. Omnicare's rebates for Flomax and K-Tab totaled $269,700 and $3,490,539, respectively, under this specific agreement. *Id.* at ¶42.

80.     ***AstraZeneca Pharmaceuticals***: In April 2000, Omnicare entered into an agreement with AstraZeneca Pharmaceuticals ("AstraZeneca") intended to increase the market share of certain AstraZeneca drugs. The agreement was described as "highly confidential," and provided for Omnicare to receive rebates of up to 13% depending on the market share Omnicare achieved for the drug Seroquel®. Pursuant to the agreement, Omnicare received a 2% rebate for achieving market share greater than 5%, a 5% rebate for market share greater than 10%, and 13% for market share greater than 40%. In addition, Omnicare received a 1% rebate in exchange for positioning Seroquel as the "Preferred First Line Atypical Anti-Psychotic." Omnicare and AstraZeneca entered into similar agreements regarding other drugs, such as Zestril and Nolvadex, during other calendar quarters. In 4Q01, these contractual rebates amounted to $2,985,985 for Seroquel, $9,794,130 for Zestril, and $419,657 for Nolvadex. *Id.* at ¶43.

81.     ***Bayer Corporation***: In 4Q01, Bayer Corporation ("Bayer") paid Omnicare rebates totaling $1,576,116 for increasing market share and providing other preferential treatment for Bayer drug Adalat CC. Omnicare had other agreements with Bayer to increase market share of Bayer

- 34 -

drugs, including an agreement in 1999 whereby Bayer agreed to and did pay Omnicare a 4% rebate for market share between 2% and 5%; 8% rebate for market share between 5.1% and 10%; and a 27% rebate for market share of 30.1% or higher for the drug Baycol. *Id.* at ¶44.

82.     ***Eli Lilly & Co.***: Omnicare and Eli Lilly & Co. ("Eli Lilly") entered into an agreement concerning the drug Zyprexa, whereby Omnicare agreed to grant preferential treatment to Zyprexa over competing drugs, and Eli Lilly paid Omnicare a 9.5% rebate totaling $9,874,262, for increasing Zyprexa's market share. Omnicare and Eli Lilly entered into similar arrangements for Zyprexa and other drugs during other calendar quarters. *Id.* at ¶45.

83.     ***Merck & Co., Inc.***: In 1999, Merck & Co., Inc. ("Merck") entered into an agreement to pay Omnicare rebates ranging from 5% to 28% of its purchases of Prinivil, Vasotec, Prinzide, Mevacor, Zocor, Tim-XE, Cozaar, Hyzaar and Fosamax, in exchange for Omnicare's increasing the market share of the aforementioned drugs and promising not to engage in any programs or initiatives that would divert sales of these drugs. In exchange for increasing the market share of these drugs, Merck paid Omnicare a quarterly check for the total sum of rebates owed. Omnicare entered into similar agreements with Merck in other years as well. *Id.* at ¶47.

84.     ***Novartis***: During 4Q01 and in other quarters, Omnicare accepted rebates from Novartis for granting preferential treatment to Novartis drugs, Miacalcin, Exelon, Clozaril and Trileptal. In exchange for increasing the market share of these drugs, Omnicare received an 8% rebate on Miacalcin purchases for a total of $1,068,955; a 15% rebate on Exelon for a total of $1,509,117; a 13% rebate on Clozaril for a total of $1,035,489; and a 1.1% rebate on Trileptal for a total of $38,142. *Id.* at ¶48.

85.     ***Novo Nordisk***: In 4Q01, Omnicare received concealed discounts from Novo Nordisk totaling $6,284,874, in exchange for Omnicare's granting preferential treatment for certain drugs

manufactured by Novo Nordisk.  Specifically, Omnicare received a 53.2% rebate amounting to: (a) $2,223,211 for purchases of Novolin N®; (b) $2,113,554 for purchases of Novolin 70/30®; and (c) $1,948,109 for purchases of Novolin R1®.  *Id.* at ¶49.

86.     ***Pharmacia***: Omnicare entered into contracts with Pharmacia whereby Omnicare received rebates for increasing the market share of, and granting preferential treatment to, Pharmacia drugs.  For example, in 4Q01, Pharmacia received the following rebates for pushing market share to Pharmacia drugs: (a) 15%, or $4,074,093, on purchases of Celebrex, (b) 12%, or $838,171, on purchases of Ambien®; (c) 13%, or $826,022, on purchases of Detrol®; (d) 6%, or $292,892, on purchases of Xalatan®; (e) 4%, or $92,598, on purchases of Mirapex®; (f) 2%, or $36,588, on purchases of Zyvox®; and (g) 11%, or $244,587, on purchases of Fragmin®.  *Id.* at ¶50.

87.     ***Ivax***: Ivax Pharmaceuticals, Inc. ("Ivax") is a private company based in Miami, Florida that manufactures generic drugs.  In 1998 and 1999, Omnicare officers Dan Maloney ("Maloney") (Director of Purchasing) and Bien approached Ivax to encourage the drug manufacturer to launch generic forms of drugs with patents soon to expire.  Ex. 41 at ¶¶14-15.[20]  In an effort to encourage Ivax to launch the generic forms, Bien and Maloney advised Kim West, Ivax's Vice President of Sales & Marketing, that Omnicare would utilize "Therapeutic Interchange Programs" to encourage physicians to utilize Ivax's generic drugs.  *Id.* at ¶¶15-16.  In a letter dated May 24, 1999, Maloney provided specific examples of the drugs Omnicare could push, including a generic forms of Prozac, the popular antidepressant.  *Id.* at ¶16.

88.     By mid-1999, Ivax and Omnicare reached an agreement, pursuant to which Ivax paid Omnicare an $8 million "signing bonus" and a 5% post-purchase rebate in exchange for Omnicare's

---

[20]     *United States of America, et al., ex rel. Kammerer v. Omnicare, Inc. and Ivax Pharms., Inc.*, No. 05-cv-11519-RGS (D. Mass. Mar. 4, 2009).

commitment to purchase $50 million worth of the generic drugs fluoxetine (Prozac), omeprazole (Prilosec), famotidine (Pepcid), buspirone (Buspar), terazosin (Hytrin), and enalapril (Vasotec), exclusively from Ivax between January 1, 2000 and December 31, 2002.  *Id.* at ¶¶17, 22-26, 35.

89.   Omnicare pursued this agreement despite having sought the advice of an Attorney who gave the Company a stringent warning about the appropriateness of the contract.  In a 15-page memorandum dated June 7, 1999, the attorney warned that the contract with Ivax

> carries a ***heightened*** risk that a federal or state prosecutor would determine it violates federal or state fraud abuse statutes, specifically the federal anti-kickback statute . . . the proposed arrangement, on its face, has all the characteristics of a kickback.  It involves a lump-sum cash payment (the stated "signing bonus") intended as an incentive to win Omnicare's business.

*Id.* at ¶20 (emphasis in original).

90.   Omnicare's top executives, including defendant Gemunder, were well aware of the legal implications.  Bien had specifically advised Gemunder and others that the signing bonus had triggered a red flag with the legal department.  *Id.* at ¶31.  In an effort to obtain a green light, Omnicare then consulted with a different attorney, but failed to advise the attorney about the "signing bonus," and the fact that a portion of the bonus would be received before Omnicare purchased any of Ivax's products.  *Id.* at ¶¶32-33.  Omnicare and Ivax executed the deal on December 21, 1999, but backdated the contract to April 1, 1999 to enable Omnicare to record revenue over three quarters in 1999.  *Id.* at ¶¶34-35.

**Legal Compliance**

91.   The Registration Statement falsely advised investors that Omnicare conducted its business, and its Pharmacy Services business in particular, in a lawful and ethical manner.  The Registration Statement described that Omnicare provided Consultant Pharmacist Services pursuant to federal and state mandates that require LTCFs to retain consultant pharmacists in order to improve resident care:

- 37 -

Federal and state regulations mandate that long-term care facilities, in addition to providing a source of pharmaceuticals, retain consultant pharmacist services *to monitor and report on prescription drug therapy in order to maintain and improve the quality of resident care*. The Omnibus Budget Reconciliation Act ("OBRA") implemented in 1990 sought to further upgrade and standardize care by setting forth more stringent standards relating to planning, monitoring and reporting on the progress of prescription drug therapy, as well as overall drug usage. *We provide consultant pharmacist services, which help clients comply with the federal and state regulations applicable to nursing homes*. The services offered by our consultant pharmacists include:

\*       \*       \*

- *assistance to the nursing facility in complying with state and federal regulations as they pertain to drug use* [Form 10-K, 2004, at 5, incorporated by the Prospectus at S-36].

92.     The statements in ¶91 above, were materially false and misleading when made because defendants failed to disclose the true facts, detailed in ¶¶93-99, below, which demonstrate that Omnicare: (1) did not assist LTCFs in complying with OBRA; (2) violated the Federal Anti-Kickback Statute; (3) assisted pharmaceutical manufacturers in promoting drugs for off-label use in violation of the Food, Drug and Cosmetic Act; (4) assisted pharmaceutical manufacturers in evading "Best Price" detection, in violation of the Medicaid Drug Rebate Statue; and (5) violated the False Claims Act. These practices were both unethical and illegal, rendering defendants' statements false and misleading.

93.     *The Federal Anti-Kickback Statue*: As detailed in ¶¶48-90 above, during the relevant time period Omnicare entered into contractual arrangements with pharmaceutical manufacturers, whereby the Company agreed to promote and increase the market share of manufacturers' drugs in violation of the Federal Anti-Kickback Statute. In order to promote and increase market share of the pharmaceutical manufacturers' drugs, Omnicare utilized its extensive network of pharmacy consultants that provided on-site services in LTCFs. Omnicare, as the nation's largest provider of pharmacy consulting services to nursing homes, was able to offer services to LTCFs at below-market

- 38 -

rates in exchange for their agreement to contract with Omnicare to provide drug procurement, distribution and billing services. Ex. 2 at ¶20. Once in the nursing homes, Omnicare essentially used its pharmacy consultants to channel nursing home patients to drugs chosen by Omnicare, drugs that increased the Company's revenue or profit because of the drug's reimbursement rate or kickbacks arrangements with manufacturers. Omnicare's discounted pharmacy consulting services equated to payment to LTCFs in exchange for the right to promote the drugs of its choice, in further violation of the Anti-Kickback Statute.[21]

94. ***The Food, Drug and Cosmetic Act***: As detailed in ¶¶67-71 above, Omnicare assisted J&J in the off-label promotion of Risperdal for treatment of elderly patients with dementia, in violation of the Food, Drug and Cosmetic Act ("FDCA"). "Off-label use" refers to use of a drug to treat conditions that have not been clinically evaluated and approved by the FDA. Accordingly, off-label use of pharmaceuticals subjects a patient to drugs that have not been determined safe and effective to treat their conditions. Although the FDA rejected Risperdal to treat elderly patients with dementia, the Company embarked on a massive initiative to drive Risperdal sales among the captive, elderly population in LTCFs suffering from dementia, for the sole purpose of increasing prescriptions and reaping greater revenue and profit. Omnicare's off-label promotion of Risperdal was linked to increased incidence of cerebrovascular adverse events, including stroke and even death. Ex. 31.

---

[21]    The Office of the Inspector General in its Supplemental Compliance Program Guidance for Nursing Facilities, 73 Fed. Reg. 56832 (Sept. 30, 2008), reaffirmed that provision of services at below cost or below fair market value that is tied, directly or indirectly, to Federal health care program business. *Id*. at 56844. Although issued in 2008, the Supplement did not create "new law," but rather provided details concerning liability under existing laws and regulations. *Id*. at 56836.

590440_1

95.     ***Medicaid Drug Rebate Statute***: As detailed in ¶¶58-65 above, Omnicare assisted pharmaceutical manufacturers in violating the Medicaid Drug Rebate Statute by failing to disclose the contractual rebates that Omnicare received from the manufacturers.  The Medicaid Drug Rebate Statute requires pharmaceutical manufacturers to advise Medicaid of the Best Price at which it offers its pharmaceuticals.  By failing to report rebates and entering into contractual arrangements to evade Best Price detection, Omnicare assisted pharmaceutical manufacturers in violating the law.

96.     ***The False Claims Act***: As a result of Omnicare's (1) drug-switching practices (¶¶29-45 above), (2) kickback arrangements with pharmaceutical manufacturers (¶¶48-90 above), and (3) off-label marketing of pharmaceuticals (¶¶67-71 above), the Company sought and received reimbursements from Medicaid and Medicare that the Company was not entitled to receive.  These practices violated the False Claims Act which prohibits anyone from:

(a)     knowingly presenting a false claim for payment to Medicaid or Medicare (among other government agencies);

(b)     knowingly making, using, or causing to be made or used, a false record or statement material to a false claim; or

(c)     conspiring to defraud the Government by getting a false claim allowed or paid.

31 U.S.C. §3729.  Liability under the False Claims Act subjects the violator to civil penalties equivalent to 3 times the amount of damages sustained by the Government plus an additional penalty between $5,000-$10,000.

97.     Because Omnicare: (1) failed to comply with state and federal laws and regulations; (2) provided false information to physicians in order to persuade them to write prescriptions for drugs that would not otherwise have been prescribed; and (3) changed patients prescriptions without

- 40 -

physician authorization, the Company violated the False Claims Act and received millions of dollars in reimbursements from Medicaid and Medicare that it was not entitled to receive.

98.   **OBRA**: Omnicare's pharmacy consulting practices also violated the Federal Nursing Home Reform Act, or OBRA '87, which requires each nursing home to "employ or obtain the services of a licensed pharmacist who . . . [p]rovides consultation on all aspects of the provision of pharmacy services in the facility."  42 C.F.R. §483.60(b).  OBRA further requires that:

> (1)   The drug regimen of each resident must be reviewed at least once a month by a licensed pharmacist.

> (2)   The pharmacist must report any irregularities to the attending physician and the director of nursing, and these reports must be acted upon.

42 C.F.R. §483.60(c).

99.   The OBRA requirements are intended to enable LTCF residents to "attain or maintain [their] highest practicable physical, mental, and psychosocial well-being."  42 C.F.R. §483.25. However, Omnicare violated OBRA by entering into illegal contracts with pharmaceutical manufacturers to increase the market share of certain drugs and by utilizing its consultant pharmacists to implement therapeutic initiatives to benefit drug manufacturers by pushing unapproved high-profit drugs on LTCF patients.  *See* ¶¶29-45, 48-90 above.  As a result, Omnicare's consultant pharmacists essentially became part of the drug manufacturers' sales forces and no longer were caregivers dedicated to the best interests of the nursing home patients as required by Congress under OBRA.

### OMNICARE'S CONDUCT RENDERED THE FINANCIAL STATEMENTS IN THE REGISTRATION STATEMENT FALSE AND MISLEADING

100.   Unbeknownst to investors, Omnicare's financial statements presented in the Registration Statement were materially false and misleading.  As described in ¶¶28-45, 48-90 above, Omnicare routinely: (1) engaged in drug-switching practices whereby the Company provided false

- 41 -

information to physicians, LTCFs, and others, in order to encourage physicians to prescribe more profitable drugs; (2) switched patients' prescriptions to more profitable drugs even without physician authorization; (3) entered into arrangements whereby it received inducements, or kickbacks, from pharmaceutical manufacturers in exchange for promoting drugs sold by those manufacturers; and (4) boosted sales of certain manufacturers' drugs by engaging in off-label marketing. Additionally, as set forth below, Omnicare paid kickbacks to LTCFs in order to secure pharmacy services contracts pursuant to which the Company implemented its illicit initiatives. These practices caused the Company to submit false claims to Medicaid and Medicare in violation of the False Claims Act and receive and record millions of dollars in revenue to which it was not entitled.

**Omnicare Improperly Recognized Revenue from Medicaid Reimbursements for Drugs Purchased from Johnson & Johnson**

101. Unbeknownst to investors, Omnicare's financial statements presented in the Prospectus were materially false and misleading and in violation of the Federal Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b)(2), and the False Claims Act, 31 U.S.C. §3730(h). J&J paid kickbacks to Omnicare to induce the Company to purchase, order, or recommend or arrange for the purchasing or ordering of J&J drugs. As a result, Omnicare violated the Federal Anti-Kickback Statute and all of the reimbursement claims that Omnicare presented to Medicaid for those J&J drugs were false. Omnicare also violated the False Claims Act, and, consequently, the U.S. government was entitled to reclaim those reimbursements that Omnicare improperly recognized as revenue in connection with the Company's submission of false reimbursement claims to Medicaid programs.

102. Omnicare booked the following approximate revenues in connection with its Medicaid reimbursements for drugs purchased from J&J during the period 2000 through 2004: $79.8 million in 2000, $98.1 million in 2001, $120.6 million in 2002, $148.2 million in 2003, and $182.1 million in 2004. Omnicare's financial statements for the fiscal years ended 2000 through 2004 were

- 42 -

inaccurate because all of the amounts that the Company booked as revenues in connection with its Medicaid reimbursement requests for the drugs purchased from J&J during those fiscal years were based entirely on false reimbursement claims to Medicaid.  As described in ¶¶48-90 above, Omnicare routinely entered into arrangements whereby it received inducements from pharmaceutical manufacturers to improperly boost the market shares of the drugs sold by those manufacturers. Omnicare's accounting for those false claims inflated the Company's revenues in violation of Generally Accepted Accounting Principles ("GAAP") and SEC guidance.

103.    GAAP constitutes those standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB").  SEC Regulation S-X, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.  Regulation S-X, 17 C.F.R. §210.10-01(a), requires that interim financial statements, such as quarterly financial statements, must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements.[22]

---

[22]    On June 30, 2009, the Financial Accounting Standards Board (FASB) issued Statement of Financial Accounting Standards ("SFAS") No. 168, *The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles* – a replacement of FASB Statement No. 162.  *FASB Accounting Standards Codification* (ASC) became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC, effective for financial statements issued for reporting periods that ended after September 15, 2009.  The Codification did not change existing U.S. GAAP.  These allegations use the historical references to U.S. GAAP, as such references existed during the Class Period.

104.    Omnicare failed to comply with GAAP revenue recognition criteria and Omnicare's accounting did not accurately reflect the economic substance of the underlying transactions with J&J and other drug manufacturers.  Accounting entries that are contrary to the economic substance of what has transpired are not faithful representations of the event and are inherently unreliable. Accounting must reflect the basic nature of what has transpired to provide meaningful information to investors.  The quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form.   Statement of Financial Accounting Concepts ("SFAC") No. 2, *Qualitative Characteristics of Accounting Information*, ¶160. The reliability of a measure rests on the faithfulness with which it represents what it purports to represent, coupled with an assurance for the user that it has that representational quality. To be useful, information must be reliable as well as relevant.  SFAC No. 2, Summary of Principal Conclusions – Primary Decision-Specific Qualities – Reliability.

105.    The FASB has defined revenues and described its characteristics as follows:

> Revenues are inflows or other enhancements of assets of an entity or settlements of its liabilities (or a combination of both) from delivering or producing goods, rendering services, or other activities that constitute the entity's ongoing major or central operations.

SFAC No. 2, ¶78.

> Revenues represent actual or expected cash inflows (or the equivalent) that have occurred or will eventuate as a result of the entity's ongoing major or central operations.

SFAC No. 2, ¶79.

106.    Revenues should not be recognized until they are realized or realizable and earned. According to the FASB, "an entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished

- 44 -

what it must do to be entitled to the benefits represented by the revenues."  SFAC No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶83(b).  As noted in SFAC No. 5, ¶84(a), (b) and (d), ***revenue should not be recognized by an entity until the entity has substantially accomplished what it must do pursuant to the terms of the arrangement, which usually occurs upon delivery or performance of the services***.

107.   Omnicare also did not comply with the SEC's criteria for revenue recognition.  As noted in the SEC Staff Accounting Bulletin ("SAB") No. 101,[23] the SEC staff believes that revenue generally is realized or realizable and earned only when ***all*** of the following criteria are met:

- Persuasive evidence of an arrangement exists;[24]

- Delivery has occurred or services have been rendered;[25]

- The seller's price to the buyer is fixed or determinable;[26] and

- Collectability is reasonably assured.[27]

108.   Omnicare violated GAAP and SEC guidance because:

---

[23]   SAB 101 was ultimately superseded by SAB 104 in December 2003, but the criteria for revenue recognition did not change.

[24]   SFAC No. 2, ¶63 states "Representational faithfulness is correspondence or agreement between a measure or description and the phenomenon it purports to represent."  The SEC staff believes that evidence of an exchange arrangement must exist to determine if the accounting treatment represents faithfully the transaction.  See also Statement of Position ("SOP") 97-2, ¶8.  The use of the term "arrangement" in SAB 101 is meant to identify the final understanding between the parties as to the specific nature and terms of the agreed-upon transaction.

[25]   SFAC No. 5, ¶84(a), (b) and (d).

[26]   SFAC No. 5, ¶83(a); Statement 48, ¶6(a); SOP 97-2 defines a "fixed fee" as a "fee required to be paid at a set amount that is not subject to refund or adjustment."

[27]   Accounting Research Bulletin ("ARB") No. 43, Chapter 1A, ¶1 and Accounting Principles Board ("APB") Opinion 10, ¶12.  *See also* SFAC No. 5, ¶84(g) and SOP 97-2, ¶8.

- 45 -

(a)     Omnicare failed to comply with the terms specified in the reimbursement arrangement and failed to accomplish "what it must do pursuant to the terms of the arrangement" between the Company and the U.S. government when Omnicare submitted false reimbursement claims to Medicaid programs;

(b)     Omnicare violated the False Claims Act, 31 U.S.C. §3730(h), and, consequently, the government was entitled to reclaim those reimbursements that Omnicare improperly recognized as revenues;

(c)     Omnicare's reimbursements from the government were "subject to refund or adjustment" and, where rebates were paid to Omnicare, the government did not get the benefits of the rebates that pharmaceutical manufacturers paid to Omnicare;

(d)     Where kickbacks were paid to, or received by, Omnicare, Omnicare's false reimbursement claims violated the anti-kickback statute, and the collectibility of reimbursements from the government; and

(e)     Where Omnicare improperly substituted one form of a drug for another, for the purpose of obtaining greater reimbursements from the government, Omnicare violated the False Claims Act, and the government was entitled to reclaim those reimbursements that Omnicare improperly recognizes as revenues.

109.    Omnicare failed to "fulfill the terms in the arrangement" with the U.S. government per SAB 101; Omnicare was not "entitled the benefits represented by the revenues" per SFAC No. 5, ¶83(b); and collectibility was not reasonably assured per ARB 43, Chapter 1A, ¶1, APB Opinion 10, ¶12, Concepts Statement 5, ¶84(g), and SOP 97-2, ¶8.  The terms in the arrangement that Omnicare failed to comply with were not inconsequential or minor technical requirements; but rather, those terms were an integral part of the Medicaid reimbursement process.  Violations of the False Claims

- 46 -

Act can subject the perpetrator to ***three times the Government's damages plus civil penalties of $5,500 to $10,000 per false claim***.  28 U.S.C. 2461 note; Public Law 104-410.  Violations of the anti-kickback statute can subject the perpetrator ***to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of the remuneration paid***.  42 U.S.C. §1320a-7(b)(7); 42 U.S.C. §1320a-7a(a)(7).

**Omnicare Improperly Recognized Revenues from Fees, Rebates and Discounts from Johnson & Johnson and Other Drug Manufacturers**

110.    Omnicare's financial statements were also inaccurate because the Company improperly recorded fees, rebates, and discounts from J&J and other drug manufacturers as revenues.  Rather than reducing the actual costs of Omnicare's purchases of drugs on its books, the Company improperly booked the cash inflows from the manufacturers, such as fees, discounts, rebates and concessions, as revenues.  Omnicare's cash inflows from those pharmaceutical manufacturers did not qualify as revenues because they did not result from delivering or producing goods, rendering services, or other activities that constituted the Company's major or central operations, as required by GAAP and SEC guidance.  The cash inflows from the pharmaceutical manufacturers were, in substance, payments to drive sales of drugs.  Omnicare was not entitled to recognize revenues because the Company did not, in substance, receive the payments as a result of the delivery of goods or provision of services that comprise the Company's ongoing, major operations.  SFAC No. 2, ¶78; SFAC No. 6, ¶¶78-79.  In addition, revenue may not be recognized

until it is realized or realizable and earned, and Omnicare was not entitled to the benefits represented by the revenues.  SFAC No. 5, ¶83(b).[28]

111.    The cash inducements that Omnicare received from the drug manufacturers did not satisfy the GAAP criteria for revenue recognition.  Revenue should not be recognized until it is realized or realizable and earned.  *See* ¶106 above.  Omnicare did not earn revenue from the inducements because the cash inflows were not produced as a result of the Company's ongoing major or central operations.  The payments were improperly characterized as fees for the purchase of "data," "grants," "educational funding," "sponsorships fees," and other such explanations to disguise the true purpose of the payments which was to incentivize Omnicare to expand the sales of the pharmaceutical manufacturers' drugs.

112.    The cash received as inducements also does not meet the SEC's criteria for revenue recognition.  *See* ¶107 above.  Omnicare's recognition of revenues from the inducements that Omnicare received violates SEC guidance because there is no persuasive evidence of an arrangement in which Omnicare was to deliver any products or perform any services, nor did Omnicare perform any genuine services in connection with "data," "grants," or "sponsorship fees."

113.    Omnicare and J&J entered into a "Consulting and Services Agreement" to create the false appearance of a legitimate arrangement, as if Omnicare were providing services of value in exchange for fees.  In connection with the cash inducements from J&J, Omnicare improperly

---

[28]    In Emerging Issues Task Force [EITF] Issue No. 02-16 *Accounting by a Customer (Including a Reseller) for Certain Consideration Received from a Vendor*, ¶4, the FASB crystallized earlier guidance and advised that for arrangements entered into after November 21, 2002 that rebates, discounts, and other cash concessions are not revenues and should be treated as reductions in the cost of sales.  "[C]ash consideration received by a customer from a vendor is presumed to be a reduction of the prices of the vendor's products or services and should, therefore, be characterized as a reduction of cost of sales when recognized in the customer's income statement."  *Id.*

recognized, at a minimum, a total of $8,557,413 in revenues as follows: (a) $2,500,000 in 2Q02; (b) $450,000 in 3Q00; (c) $300,000 in 4Q00; (d) $2,282,609 on purchases of Duragesic® in 4Q01; (e) $326,003 on purchases of Ultram® in 4Q01; (f) $866,096 on purchases of Ditropan® XL in 4Q01; (g) $98,640 on purchases of Topamax® in 4Q01; (h) $231,897 on purchases of Reminyl® in 4Q01; (i) $51,956 on purchases of Aciphex® in 4Q01; (j) $50,212 on purchases of Regranex® in 4Q01; (k) an additional $1,200,000 in 2001; (l) $1,200,000 in 2002; (m) $1,200,000 in 2003; and (n) $1,200,000 in 2004.  GAAP and SEC guidance required that the cash that Omnicare received from J&J be treated as reductions in Omnicare's purchase costs, rather than as increases in revenues in Omnicare's income statements during those time periods.  *See* ¶115 below, for a chart summarizing the improper revenues that Omnicare recognized from the cash inducements that the Company received from J&J and other drug manufacturers.

114.    Omnicare's undisclosed contractual relationships with drug manufacturers were not limited to J&J.  As detailed in Kammerer's initial complaint filed on January 5, 2008, this practice was routinely done with other drug manufacturers as well, including, but not limited to Abbott Labs, AstraZeneca Pharmaceuticals, Bayer Corporation, Eli Lilly & Company, Inc., Novartis, Novo Nordisk, Pharmacia, and Ivax.  In Omnicare's dealings with each of these drug manufacturers, the Company was not entitled to recognize revenues from the payments those drug manufacturers made to Omnicare because the Company did not receive the payments as a result of the delivery of goods or provision of services that comprise the Company's ongoing, major operations, as required by GAAP and SEC guidance.  SFAC No. 2, ¶78, SAB Topic 13.  In addition, revenue may not be recognized until it is realized or realizable and earned, and Omnicare was not entitled to the benefits represented by the revenues.  SFAC No. 5, ¶83(b).  Omnicare's improper accounting for the cash inducements from the drug manufacturers was qualitatively material because, among other things, it

violated the GAAP principle of reliability. That is, recording the sums received as revenue misled the public into believing that such sums were obtained as a result of the Company's core operations. The cash consideration that Omnicare received from the drug manufacturers should have been characterized as a reduction of the cost of sales rather than as revenues, and consequently, Omnicare's financial statements for fiscal years 2000 through 2002 were false. *See* Ex. 42.

115. The following chart summarizes the minimum revenues that Omnicare improperly recognized from cash inducements that the Company received from J&J and other drug manufacturers in exchange for improperly promoting their drugs:

**Omnicare Inc.**

**Summary of Cash Inducements Improperly Recognized as Revenues**

| (In thousands of dollars, except percentages) | Year Ended Dec. 31, 2000 | Year Ended Dec. 31, 2001 | Year Ended Dec. 31, 2002 | Year Ended Dec. 31, 2003 | Year Ended Dec. 31, 2004 |
|---|---|---|---|---|---|
| **Overstated Revenues:** | | | | | |
| Cash from J&J | $   3,250 | $   5,107 | $   1,200 | $   1,200 | $   300 |
| Cash from Abbott Laboratories | | 3,760 | | | |
| Cash from AstraZeneca Pharmaceuticals | | 13,200 | | | |
| Cash from Bayer Corporation | | 1,576 | | | |
| Cash from Eli Lilly & Company | | 9,874 | | | |
| Cash from Novartis | | 3,652 | | | |
| Cash from Novo Nordisk | | 6,285 | | | |
| Cash from Pharmacia | | 6,405 | | | |
| Cash from Ivax | 2,133 | 2,133 | 2,133 | | |
| **Total Overstated Revenues from Cash Inducements from Drug Manufacturers** | $   5,383 | $ 51,993 | $   3,333 | $   1,200 | $   300 |

*See also* Ex. 42.

**Omnicare Improperly Recognized Revenues from Drug Switching**

116. As set forth in ¶¶40-45 above, Omnicare defrauded the government by changing LTCF patients' prescriptions for Ranitidine (generic Zantac), a popular antacid and the second-most

- 50 -

prescribed medication in nursing homes, from tablets to capsules in order to inflate government reimbursements by as much as 400%.

117.     Beginning in 2000 and continuing to December 31, 2002, Omnicare took advantage of the fact that the government had not limited the price at which it would reimburse Ranitidine capsule prescriptions by systematically instructing its clerical staff to alter physician orders for Ranitidine from tablets to capsules, in violation of state and federal law.  Moreover, in order to create the appropriate conditions to illegally maximize their Ranitidine reimbursements, Omnicare altered its computers to make it virtually impossible for data entry clerks to enter any prescription orders for Ranitidine tablets.  Omnicare violated the False Claims Act, and was liable for treble damages and penalties because they used this scheme to obtain reimbursement for over $10 million in false claims for inflated and unjustified costs.  Consequently, Omnicare was not entitled to recognize at least $10 million in revenues during the period January, 1, 2000 through December 31, 2002 because Omnicare failed to comply with GAAP and SEC revenue recognition criteria per ¶¶106-109 above.  *See also* Ex. 42.

**Omnicare's Cash Payments to MMS and Other Nursing Home Operators Constituted Round-tripping, Resulting in Overstated Revenues**

118.     In 2004, Omnicare engaged in a sham transaction to acquire Mariner Medical Services ("MMS"), a shell corporation owned by Mariner that the Company purchased for nearly $50,000,000.  Omnicare not only failed to report the transaction, but improperly recorded more than $47 million in revenue and goodwill.

119.     Mariner is a Delaware corporation headquartered in Atlanta, Georgia, and prior to and during 2004 was one of the largest nursing home chains, operating approximately 252 nursing homes with 32,000 nursing home beds.  Ex. 12 at ¶9.  On April 1, 2003, Omnicare and Mariner entered into a 64-month contract for pharmacy services.  *Id*. at ¶27.  Pursuant to the contract, Omnicare agreed to

- 51 -

implement drug-switching programs with the specific goal of saving Mariner $2.5 million per year. *Id*.  During the contract period, Mariner was Omnicare's largest nursing home customer, generating approximately $155 million in revenue and $26 million in profit for Omnicare in 2004 alone.  *Id*. at ¶28.

120.    Fifteen months into the contract, on June 29, 2004, Mariner announced that it was being sold to National Senior Care, Inc., and the transaction consummated on December 10, 2004. *Id*. at ¶29.  On November 23, 2004, just prior to the acquisition's close, Mariner sent Omnicare a Termination Notice, stating that the 2003 contract between Mariner and Omnicare would terminate upon close of the acquisition.  *Id*. at ¶31.[29]

121.    On December 2, 2004, defendants Gemunder and Froesel met with Mariner's agents, who proposed that Mariner would withdraw the Termination Notice in exchange for Omnicare's agreement to purchase one of Mariner's business units, called MMS.  *Id*. at ¶32.  MMS was a shell corporation with just two employees and no tangible assets apart from accounts receivable valued at less than $3 million.  *Id*.  The sole function of MMS was to deliver feeding tube supplies to Mariner nursing homes and bill Medicare for the supplies.  *Id*.  Mariner's agents further explained that the objective of the Termination Notice and the proposal to withdraw the notice was to obtain financing for the acquisition.  *Id*. at ¶33.

122.    During the meeting, Gemunder contacted its outside counsel to discuss the proposal. *Id*. at ¶34.  Omnicare's attorneys advised Gemunder that to condition the Termination Notice withdrawal on Omnicare's agreement to purchase MMS would constitute a violation of the Federal

---

[29]    Post-acquisition, Mariner nursing homes was divided between Mariner and a newly created entity called Sava (collectively, "Mariner").  *Id.* at ¶29.

Anti-Kickback Statute because Omnicare would effectively be paying Mariner for utilizing Omnicare's pharmacy services. *Id.*

123.    On December 7, 2004, Omnicare's board of directors met to consider the proposal. *Id.* at ¶38. An internal Omnicare memorandum explained that Omnicare would be paying an exorbitant sum for a business unit worth very little:

> "For the total anticipated consideration to the seller of $50,000,000, plus estimated transaction-related expenses of $285,000, Omnicare will receive tangible assets with an estimated net book value of $2,904,000 [consisting of accounts receivable] and create goodwill and other intangible assets of $47,381,000."

*Id.* However, one of Omnicare's investment bankers noted that with "3 YEARS LEFT ON [THE] CURRENT DEAL," Omnicare would be giving up "$155MM/REVS [and] $26MM/OP PROFITS" per year. *Id.* at ¶39. Consequently, the Omnicare board approved the acquisition for $50 million, and Omnicare paid $40 million up front before the deal closed. *Id.* at ¶¶46-48.

124.    Notwithstanding Omnicare's outside counsel's advice that the Company's acquisition of MMS must not be consummated for the purpose of retaining the pharmacy services contracts, Omnicare effected the transaction to retain the contracts. *See id.* at ¶¶49-56. In an effort to ensure that Mariner would not run afoul of the agreement, Omnicare insisted that Mariner sign new 15-year pharmacy services contracts with Omnicare prior to paying the $40 million. Mariner complied and signed the new contracts first. *Id.* at ¶47.

125.    Healthcare regulatory lawyers representing Omnicare explained to Mariner that "simultaneous sale of [MMS] could be viewed as consideration for the pharmacy contracts." *Id.* at ¶¶43-45. Accordingly, in order to obtain the approval of counsel, Omnicare misrepresented that MMS was not owned by Mariner. *Id.* at ¶¶49-56. Ultimately, Omnicare's outside counsel conditioned his approval of the transactions on receipt of signed certificates attesting to the

- 53 -

independence of the acquisition and the pharmacy services contracts.  *Id.* at ¶52; *see also id.* at ¶¶57-59.

126.     As detailed herein, on or about December 10, 2004, Omnicare paid $40 million for MMS, followed by a payment of $10 million on June 30, 2005 - for a total payment of $50 million. Omnicare accounted for the transaction by recording the entire $50 million as assets – $2,904,000 in tangible assets (accounts receivable) and the remaining $47,096,000 in goodwill.  Additionally, the Company capitalized its transaction costs, recording an additional $285,000 in goodwill, for a total of $47,381,000 in goodwill.

127.     Omnicare's accounting treatment of the MMS acquisition costs was improper.  The Company was not entitled to record any of the MMS acquisition costs as goodwill.  Goodwill is defined as "[t]he excess of the cost of an acquired entity over the net amounts assigned to assets acquired and liabilities assumed."  SFAS No. 141, *Business Combinations*, Appendix F, Glossary, Goodwill.  However, according to GAAP, Omnicare could only recognize goodwill in connection with MMS to the extent the Company "*expected to benefit from the synergies of the combination*." SFAS No. 142, ¶34.  But MMS had no core business, cash flows, or operation, other than to collect the outstanding accounts receivables worth just $2,904,000.  The MMS acquisition was, in fact, a canard, and Omnicare paid $47,096,000 in excess of the fair value of MMS' total net assets solely for the purpose of obtaining new 15-year contracts with Mariner.  Accordingly, Omnicare did not expect the MMS entity to yield any synergies and should not have recorded the $47,096,000 as goodwill.  Similarly, the $285,000 in transaction-related costs for the MMS transaction should not have been recognized as part of goodwill.  Such amounts spent were not expected to yield synergies, but simply amounted to the cost of effecting the transaction.

- 54 -

128.   Omnicare also improperly recorded sums received from Mariner pursuant to the pharmacy services contracts as revenue.  When Omnicare agreed to purchase MMS in 4Q04, Omnicare effectively agreed to pay $47,096,000 in *excess* of MMS's true value of $2,904,000. Omnicare did this in order to get Mariner to sign new 15-year contracts with Omnicare, and in fact, Omnicare required Mariner to sign those contracts before it agreed to buy MMS.  The signing of the contracts in late 4Q04 and Omnicare's purchase of MMS were "linked" transactions.  In substance, Omnicare bought $47,096,000 of its own future revenues from Mariner because the $47,096,000 in funds flowed from Omnicare to Mariner, and then back again to Omnicare.  This circular flow of funds is called "round-tripping" and no legitimate earnings process occurred.  Accordingly, Omnicare improperly recorded revenue for the first $47,096,000 received from Mariner under the contracts.

129.   Round-tripping is a scheme used to improperly inflate revenues.  The AICPA has described round-trip transactions as follows:

> "Round-trip" or "linked" transactions occur when a company enters into a seemingly valid sales transaction with a customer but sends all or some of the sales proceeds back to the customer in another seemingly valid purchase transaction often affecting a different accounting period.

*Practice Alert 2003-01*, AICPA, June 2007.

130.   Recording revenues in a round-trip transaction violates GAAP because it elevates form over substance.  In a round-trip revenue recognition transaction, the economic substance of the transaction is a circular flow of cash (or other assets of value), rather than an arm's-length transaction.  *See* ¶¶104-107 above.

131.   Omnicare round-tripping transactions failed to comply with the GAAP requirement that "cash consideration (including a sales incentive) given by a vendor to a customer is presumed to be a reduction of the selling prices of the vendor's products or services and, therefore, should be

- 55 -

characterized as a reduction of revenue when recognized in the vendor's income statement." EITF Issue No. 01-9, *Accounting for Consideration Given by a Vendor to a Customer (Including a Reseller of the Vendor's Products)*, ¶9.

132.    The revenues in round-tripped transactions also do not meet the GAAP criteria and SEC guidance for revenue recognition as described in ¶¶104-107 above.  Revenue is not earned in a round-trip transaction because the company initiating the round-trip transaction is using its own cash or other assets to "buy" or "create" revenues, and the cash inflows were not produced as a result of the company's ongoing major or central operations.  Omnicare violated these principles of revenue recognition when it recorded $47,096,000 in revenue from Mariner.  As a result of the transaction with Mariner and MMS, Omnicare overstated goodwill by $47,381,000 and improperly overstated recognized revenues and operating income of $47,096,000 in 2004 in connection with the bogus MMS acquisition.  *See* Ex. 42.

133.    Additionally, the MMS transaction was a reportable event under GAAP.  In FY04, Omnicare reported $398.6 million in cash payments for acquisitions.  The MMS transaction alone represented about 14.8% of the Company's total goodwill acquired and 17.4% of the Company's goodwill acquired in the Pharmacy Services Segment in 2004.  Moreover, the $47,381,000 in "goodwill" constituted 34.4% of the total goodwill acquired by Omnicare and 48.9% of the goodwill acquired in the Pharmacy Services Segment, in 4Q04.

134.    Indeed, SFAS No. 141, requires a company to disclose both material business combinations and business combinations in which amounts assigned to goodwill represent a "significant" portion of the total acquisition costs.  SFAS No 141, ¶52.  Accordingly, in connection with Omnicare's acquisition of MMS in 2004, Omnicare failed to disclose the following information required by GAAP:

- 56 -

- The name and a brief description of the acquired entity and the percentage of voting equity interests acquired;

- The primary reasons for the acquisition, including a description of the factors that contributed to a purchase price that results in recognition of goodwill;

- The period for which the results of operations of the acquired entity are included in the income statement of the combined entity;

- The cost of the acquired entity and, if applicable, the number of shares of equity interests (such as common shares, preferred shares, or partnership interests) issued or issuable, the value assigned to those interests, and the basis for determining that value; and

- A condensed balance sheet disclosing the amount assigned to each major asset and liability caption of the acquired entity at the acquisition date.

*Id.* at ¶51.  In addition, because the amount Omnicare assigned to goodwill in connection with the MMS acquisition, *i.e.*, $47,381,000, was "significant in relation to the total cost of the acquired entity" of $50 million, Omnicare failed to comply with the requirement to disclose the total amount of goodwill for the MMS acquisition.  *Id.* at ¶52.

135.    Omnicare also paid kickbacks to other nursing home owners in exchange for pharmacy services contracts in connection with Omnicare's acquisitions of other pharmacy service operators.

136.    Omnicare acquired Medistat Pharmacy Services in early 2004, and in connection with that acquisition, Medistat paid $6 million to an individual who owned the Avante nursing home chain in exchange for a pharmacy services contract with Avante.  Omnicare's purchase of Medistat required that Omnicare separately pay $6 million to the owner of the Avante nursing home chain, and Omnicare subsequently benefitted from the contract with Avante after the acquisition was completed.  In substance, therefore, Omnicare bought $6 million of its own revenues by overpaying that amount to acquire Medistat in order to secure the nursing home contract with Avante.

137.    In August 2004, Omnicare also paid kickbacks to nursing home operators in exchange for nursing home contracts is connection with its $50 million acquisition of Pharmco.  In connection with the Pharmco acquisition, Omnicare paid $1 million to two shareholders of Pharmco specifically to obtain pharmacy service contracts with nursing home chain Cypress Healthcare ("Cypress").  In substance, therefore, Omnicare bought $1 million of its own revenues by overpaying that amount to acquire Pharmco in order to secure the nursing home contract with Cypress.

138.    In mid-2004, Omnicare acquired Total Pharmacy, a company that provided pharmaceutical products exclusively to nursing homes owned or controlled by Philip Esformes and/or his father Morris ("Esformes-Controlled Nursing Homes").  Ex. 13 at ¶¶36-40.  Philip Esformes was a part-owner in Total Pharmacy.  *Id.* at ¶¶36-37.  Prior to the acquisition, Total Pharmacy maintained one-year contracts with the Esformes-Controlled Nursing Homes.  *Id.* at ¶¶43-48.  Initially, Omnicare offered to pay $16-$18 million for Total Pharmacy, including $7 million in accounts receivables – effectively a $9-$11 million offer.  *Id.* at ¶49.  Morris Esformes and the owners of Total Pharmacy (*i.e.*, Tim Dacy with a 51% interest, Philip Esformes with a 40% interest, and Bruce Paler with a 9% interest) were dissatisfied with the $16 million offer.  Defendant Gemunder thus negotiated with Morris Esformes to pay Total Pharmacy $25 million and forfeit the $7 million in accounts receivable if the Esformes-Controlled Nursing Homes would extend their pharmacy services contracts from one year to ten years.  *Id.* at ¶¶50-54.  *See also id.* at ¶¶55-59.  The parties agreed to backdate the contracts with the Esformes-Controlled Nursing Homes and Omnicare completed the acquisition of Total Pharmacy in June 2004.  As a result, Omnicare paid an additional $16-$23 million to the owners of Total Pharmacy for the sole purpose of securing extended pharmacy services contracts with the nursing homes.  Omnicare thereby round-tripped at least $16

million of revenues because Omnicare in substance bought $16 million of its own revenues from those nursing homes.

139.    In connection with Omnicare's acquisitions of Medistat, Pharmco, and Total Pharmacy, Omnicare improperly obtained guaranteed referrals for services for which payment was made by government health care programs.  Omnicare obtained those guaranteed referrals by overpaying for those acquisitions or making separate side payments to obtain the business. Omnicare's cash inducements to obtain contracts with Avante and Cypress, and nursing homes controlled by one of the owners of Total Pharmacy were tantamount to round-tripped funds because $6 million of the Avante revenues, $1 million of the Cypress revenues, and at least $16 million of the Total Pharmacy revenues from those respective contracts were bought with Omnicare's own money.  Consequently, Omnicare inflated its revenues and operating income on its income statements by the amounts of those overpayments. *See* the accounting guidance described in ¶¶104-107, 129-131 above; *see also* the financial impact of Omnicare's overstatements of revenues and operating income in the chart shown in Ex. 42.

140.    Moreover, Omnicare's total acquisitions in 2004 in the aggregate were unquestionably material and, as such, Omnicare failed to follow required GAAP disclosures.  Even if a series of business combinations completed during the period are individually immaterial, they may be material in the aggregate.  In such cases, a company must disclose the number of entities acquired and a brief description of those entities. Ex. 13 at ¶53.  Omnicare's total acquisitions in 2004 were material and the Company failed to make appropriate disclosures.  Instead, the Company advised investors that none of its acquisitions were "individually significant."

**The Prospectus Misrepresented Omnicare's Collection Practices and Doubtful Accounts and Valuation of Receivables**

141.     The Prospectus also materially misrepresented and failed to disclose the Company's practices with respect to collections and past-due accounts.  Defendants improperly recognized revenue on such accounts even though collections were not reasonably assured.  Because Omnicare did not accurately account for uncollectible accounts in its financial statements, Omnicare's Registration Statement and Prospectus materially overstated operating income by at least $100 million as of the nine months ended September 30, 2005.  *See* Ex. 42.

142.     The 2004 Form 10-K, incorporated by reference in the Prospectus, contained the following statements about the Company's Critical Accounting Policies:

Revenue Recognition

*Revenue is recognized by Omnicare when products or services are delivered or provided to the customer*.

*     *     *

Allowance for Doubtful Accounts

Collections of accounts receivable from customers is the Company's primary source of operating cash flow and is critical to Omnicare's operating performance. Omnicare's primary collection risk relates to facility and private pay customers. The Company provides for accounts receivable that could become uncollectible by establishing an allowance to reduce the carrying value of such receivables to their estimated net realizable value. *Omnicare establishes this allowance for doubtful accounts using the specific identification approach, and considering such factors as historical collection experience (i.e., payment history and credit losses) and creditworthiness, specifically identified credit risks, aging of accounts receivable by payor category, current and expected economic conditions and other relevant factors*. *Management reviews this allowance on an ongoing basis for appropriateness*. Judgment is used to assess the collectability of account balances and the economic ability of customers to pay.

*Id.*

143.     The Company reported the following past-due accounts receivable in its 2004 Form 10-K:

| Period Ending | 0-180 Days Past-Due | > 180 Days Past-Due |
|---|---|---|
| December 31, 2004 | $792,895 | $169,098 |
| December 31, 2003 | $654,037 | $133,031 |

144.   The Company also made the same representation regarding its Allowance for Doubtful Accounts in the 1Q05, 2Q05 and 3Q05 Form 10-Q's:

| Period Ending | 0-180 Days Past-Due | > 180 Days Past-Due |
|---|---|---|
| March 31, 2005 | $815,187 | $187,991 |
| December 31, 2004 | $792,895 | $169,098 |

| Period Ending | 0-180 Days Past-Due | > 180 Days Past-Due |
|---|---|---|
| June 30, 2005 | $840,072 | $203,303 |
| December 31, 2004 | $792,895 | $169,098 |

| Period Ending | 0-180 Days Past-Due | > 180 Days Past-Due |
|---|---|---|
| Sept. 30, 2005 | $1,146,490 | $270,046 |
| Dec. 31, 2004 | $792,895 | $169,098 |

145.   According to CW2, a former Omnicare Account Specialist from September 2004 to August 2005, Omnicare did not adequately reserve for doubtful receivables and did not write-off known uncollectible receivables.[30]   As part of CW2's regular duties at Omnicare, CW2 prepared internal reports that detailed which receivables were required to be written-off.  Before writing-off an uncollectible receivable, all collection efforts must be exhausted and it must be determined that

---

[30]   CW2 worked in a department consisting of four collection specialists who were responsible for collections throughout the United States.  Each specialist was responsible for a particular region and CW2 was responsible for the Midwest Region.  CW2 reported to the Manager of Credit and Collections, which was Nancy Chouteau ("Chouteau") until mid-2005 and Susan Ruschuer thereafter.  Both Chouteau and Ruschuer reported to Director of Credit and Collections Richard Richow ("Richow"), who reported to defendant Gemunder and others.  CW2's responsibilities included collecting outstanding balances that facilities owed to Omnicare pharmacies by entering into promissory arrangements with the facilities.  CW2's proposed promissory notes were approved by Richow and then forwarded to Gemunder for final approval.

future collection is not reasonably assured.  It was CW2's experience that defendant Gemunder and

the senior management, including Richow, Director of Credit and Collections, denied write-offs that

met this criteria.  CW2 states that the senior management would decide not to push for payment of

past due accounts from facilities that were still active because Omnicare was still making money off

them and Omnicare did not want to "piss them off."  According to CW2, even if a facility had an

outstanding unpaid balance of, *e.g.* $4 million, Omnicare would neither attempt collection, nor write

off the amount, if the facility was still requesting monthly services, *e.g.* amounting to $400,000, that

could be entered into Omnicare's books as revenue.  Because these receivables should have been

written-off, other current and past sales transactions with the same customers were improperly

recognized as revenue.  Because Omnicare could not collect from such customers, collectability was

not reasonably assured from those customers under GAAP.  However, Omnicare inaccurately

recorded these transactions as revenue.  These customers did not have immaterial outstanding

receivable balances but rather substantial balances of up to $2 million per account.

146.    Furthermore, CW2 states that defendants failed to reserve or write-off receivables for

debtors that had entered into bankruptcy proceedings.  CW2 stated that $100 million of accounts

receivables were outstanding 90 days or more (some of which constituted charges rendered back in

2003 and 2004) and that as much as 60% of accounts receivables were uncollectible.  Had

defendants properly accounted for Omnicare's uncollectible accounts and current transactions,

Omnicare's financial statements would have revealed Omnicare's dire financial situation, as net

income and EPS would have been completely eliminated.  Because Omnicare did not accurately

account for uncollectible accounts in its financial statements, Omnicare's Registration Statement and

prospectus materially overstated operating income by at least $100 million as of the nine months

ended September 30, 2005.

147.    CW3, a former Regional and National Facility Analyst in Omnicare's National Credit and Collections Department in Omnicare's headquarters in Covington, Kentucky, corroborated Omnicare's failure to write-down receivables that were uncollectible.  In the midst of government investigations into Omnicare's billing practices and Omnicare's attempted settlement with the Michigan Attorney General concerning Medicaid fraud charges, the Company became concerned that the scheme would be exposed.  Accordingly, beginning in June 2006, Omnicare created new positions, including CW3's position, to begin collecting on, or create the appearance of collecting on, the outstanding facilities charges discussed above, which included charges for supplies and non-prescription drugs that are not reimbursed by the government.  CW3 was hired in June 2006 and initially focused on collections in eight states, but was eventually promoted to take responsibility for the state of New York which had a very high concentration of Omnicare facilities.[31]

148.    According to CW3, Omnicare made no attempt to collect unpaid accounts receivable on facilities charges prior to June 2006.  In fact, Omnicare had no genuine intention to collect outstanding accounts receivable for many of the facilities charges because Omnicare had agreed to pay those charges in exchange for LTCFs' promises to purchase more prescription drugs than necessary from Omnicare, thereby inflating Omnicare's reimbursements from Medicare and Medicaid.  According to CW3, Omnicare would induce an LTCF to over-prescribe drugs worth, *e.g.*

---

[31]    CW3 reported to Manager Ruscher who reported to Director Richow.  CW3's daily responsibilities were to seek payment on accounts receivable in the state of New York which amounted to more than $25 million.  CW3's job was to negotiate a settlement figure that everyone was comfortable with, which typically amounted to about $2 million per month – just a fraction of what was on the books as accounts receivable.  A typical settlement amounted to $200,000 on a $3 million debt.  The process of settling the accounts involved CW3's submission of a proposed written settlement to Ruscher, which would be forward to Richow for approval, and then ultimately to defendants Froesel and Gemunder who would bring the proposal to the Board of Directors for their approval.  CW3 was uncertain whether the facilities ever actually paid the settlement amount.

$500,000, that were reimbursable from government sources, in exchange for Omnicare's promise not to collect on, *e.g.* $100,000, in facilities charges.  CW3 learned of the scheme because, upon contacting nursing homes to discuss payment of the facilities charges, the facility owner or administrator would refuse to agree to any settlements concerning the facilities charges and state that he/she would "be taking [the matter] up with Joel [Gemunder]" who had struck the deal with facility. CW3 specifically recalled that when he attempted to collect on tens of millions of dollars in outstanding bills from Catholic Charities, which ran a number of nursing homes in New York, the part-owner with whom CW3 spoke said "I'm not dealing with you.  I'll just call Joel."  According to CW3, the Regional Controllers as well as the presidents and/or executive directors of Omnicare pharmacies would receive a cut of the profit from these schemes as an incentive to keep quiet.  CW3 stated that Omnicare employees were well aware that these practices amounted to kickbacks and both Ruscher and Richow were constantly worried that the Company would be charged with "inducement."  CW3 estimated that accounts receivable associated with these facilities charges schemes amounted to $500 million.

149.    CW3 ultimately learned that the primary purpose of his position was to give the "appearance" of collecting on the facilities charges, not actually to collect on them, and that CW3 and his/her colleagues recognized that "the only reason we had a job was to cover up inducements." As a result of this conduct, Omnicare not only improperly boosted its revenue through higher Medicaid or Medicare reimbursements, but also overstated its accounts receivable and understated its allowance for doubtful account.

150.    CW4, a former Omnicare Collections Specialist based at Covington Headquarters from November 2004 to April 2006 whose responsibilities included collection of accounts in the State of Connecticut that were 90 days past due, also corroborates the collection issues within

CW4's geographic region.[32]   CW4 estimated that 25% of all individuals in LTCFs located in Connecticut lacked prescription benefits.  CW4 further indicate that of those individuals lacking prescription benefits, 40-60% lacked the resources to pay their debt balance owed to Omnicare.  According to CW4, the 90-days past due at Omnicare's Connecticut region was a few million dollars in 2004 and 2005.  CW4 alone managed the past-due accounts that were more than 90-days past due and CW4's portfolio was estimated to be worth over $1.4 million.  CW4 also states that his/her colleague had a larger collections portfolio in the same region, further supporting that Omnicare did not adequately reserve for doubtful receivables and did not write-off known uncollectible receivables.

151.   CW5 is a former Regional Staff Accountant in Omnicare's Northwest Ohio office in the Great Lakes region from March 2005 to August 2006 whose job was to handle the reconciliation of accounts payable, accounts receivable and aging accounts for her region as well as month-end journal entries, quarterly reports and Sarbanes-Oxley reports.[33]   CW5 states that in March 2005, CW5 observed that the number contained in the computer system for aging accounts receivable did not match the numbers in the ledger.  In fact, Omnicare's bookkeeping of aging accounts receivable information was so sloppy that reconciliation was not possible.  Omnicare did not keep information detailed enough to identify the discrepancy to any specific accounts.  To resolve the discrepancy, *CW5's supervisor advised her to plug the difference into current to avoid any inquiries from the auditors*.  CW5 would be instructed to plug discrepancies into current even when the account, or

---

[32]   CW4 reported to Manger Chouteau who reported to Director Richow.  CW4 was one of two individuals responsible for collections of receivables 90 days past-due in the state of Connecticut.

[33]   CW5 reported to John Girts, Controller for Omnicare in Northwest Ohio, who reported to Brian Sedlock ("Sedlock"), Controller of the Great Lakes Region.

facility, no longer existed.  CW5 states that this was a standard practice at Omnicare for reconciling aging accounts receivable.  CW5 and his/her colleagues acknowledged that "there is the way you learned it in school, and then there's the Omnicare way," meaning that the Company's accounting practices were improper.  According to CW5, when external auditors came to the office, they were only given the general ledger and never saw the backup.  As a result of these practices, Omnicare overstated accounts receivable and understated its aging A/R and allowance for doubtful account.

152.   Defendants falsely inflated Omnicare's net income and EPS by not adequately reserving for and failing to write-off uncollectible receivables, rendering the Prospectus false and misleading.  Omnicare's failure to reserve for and write-off uncollectible receivables was in violation of GAAP and SEC rules.  When it is believed that receivables will likely become uncollectible, GAAP mandates that an allowance be recorded by incurring an expense in the period that this becomes known.  Such loss contingencies are required by SFAS No. 5, *Accounting for Contingencies*.

153.   Additionally, GAAP requires "an expense or loss is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated." SFAS No. 5, ¶87.  Omnicare's financial statements violated the most basic theories of accounting which require doubtful receivables to be reserved for and uncollectible receivables to be written-off as charges to earnings in the applicable reporting periods.  Contrary to GAAP, obvious uncollectible receivables remained on Omnicare's balance sheet with no corresponding reserves or write-off of uncollectible accounts.  Furthermore, defendants improperly recognized revenue on these transactions because collection was not reasonably assured.  The GAAP and SEC guidance are discussed in further detail in ¶¶104-107 above.

- 66 -

154.    CW6, a former Senior Staff Accountant from August 2004 to mid-2006 who worked at Omnicare's headquarters in Covington, Kentucky, also corroborates on Omnicare's improper accounting practices.[34]  According to CW6, Omnicare's accounting practice was to make financial reporting look good, not to make it accurate.  In particular, during CW6's tenure, Medicaid and Medicare accounts receivable were huge.  CW6 further states that Omnicare also had a huge "unapplied cash."  Omnicare was putting unapplied cash into accounts receivable that had no relationship to the cash applied because Omnicare's senior management, including defendants Gemunder and Froesel, preferred consistent percentages in the aging buckets from month to month, particularly in the 30-60 day aging bucket for accounts receivable.  CW6 states that the sum associated with accounts receivable and unapplied cash was huge, and that for a typical pharmacy in a typical month, "we'd be talking about over $2 million of aging in unapplied cash."  CW6 further states that the percentage of unapplied cash applied to the oldest receivables may have varied from region to region but the goal of "making it look good, not accurate" was the same.  According to CW6, if "unapplied cash jumped or dipped in a month, the CFO (Froesel) and CEO Gemunder would ask for an answer" because they wanted to see "the same percentage" from month to month. As a result of this practice, CW6 states that old aging – 180 days and older – was "never written off."

155.    Unapplied cash is a liability account.  Omnicare should normally record the money it receives in the unapplied cash account when there is no invoice to credit a customer's accounts

---

[34]    CW6 was responsible for several regions, including the Great Plains region.  CW6 reported to Controller Chris Guin who reported to RCFO Sedlock.  CW6 was responsible for preparing what was called the "Froesel Report" for the Great Plains region containing the status of accounts receivable.  In order to prepare the report, CW6 would get a summary of accounts receivable and unapplied cash, but never got any backup.  The Froesel Report was delivered to defendants Froesel and Gemunder every month during a meeting in Covington, attended by the RCFOs.

receivable balance, the invoice number is unknown, or a customer has made a duplicate or additional payment to an existing but previously paid invoice. Unapplied cash is a liability account because it possesses the characteristics of a liability as defined in the accounting literature. "A liability has three essential characteristics: (a) it embodies a present duty or responsibility to one or more other entities that entails settlement by probable future transfer or use of assets at a specified or determinable date, on occurrence of a specified event, or on demand, (b) the duty or responsibility obligates a particular entity, leaving it little or no discretion to avoid the future sacrifice, and (c) the transaction or other event obligating the entity has already happened." SFAC No. 6, ¶36. Omnicare was not entitled to arbitrarily apply funds from the substantial unapplied cash account to any accounts receivable account, let alone to the older accounts receivable items, unless those funds could be properly matched with specific unpaid customer invoices. Omnicare was also obligated to return the funds in the unapplied cash account to customers when those funds could not be matched to specific unpaid customer invoices. "Entities routinely incur most liabilities to acquire the funds, goods, and services they need to operate and just as routinely settle the liabilities they incur. For example, accepting a cash deposit or prepayment obligates an entity to provide goods or services or to refund the cash." *Id.* at ¶38. "Once incurred, a liability continues as a liability of the entity until the entity settles it, or another event or circumstance discharges it or removes the entity's responsibility to settle it." *Id.* at ¶42.

**Omnicare's Failure to Disclose Risks and Uncertainties**

156.    GAAP and SOP 94-6, *Disclosure of Certain Significant Risks and Uncertainties*, requires that financial statements prepared in conformity with GAAP must disclose known risks and uncertainties due to the nature of operations and certain significant estimates. Such risks and uncertainties include litigation-related obligations and contingent liabilities.

- 68 -

157.    Omnicare improperly failed to disclose the risk that its improper accounting for its scheme to inflate earnings by improperly overcharging Medicaid LTC customers and engaging in drug substitutions created undisclosed contingencies related to these scams that could result in a material adverse impact to the Company should the practice be discontinued or discovered.  In its failure to disclose these conditions, Omnicare violated GAAP:

> Disclosure regarding an estimate should be made when known information available prior to issuance of the financial statement indicates that ***both*** of the following criteria are met:

>> a. It is at least reasonably possible[35] that the estimate of the effect on the financial statements of a condition, situation, or set of circumstances that existed at the date of the financial statements will change in the near term due to one or more future confirming events.

>> b. The effect of the change would be material to the financial statements.

*Id.*

158.    Moreover, even if in the extreme event that it were not probable that Omnicare did not incur a liability or loss by the date of the financial statements, or the loss amount could not be reasonably estimated, disclosure of the loss contingency was still required because, at a minimum, there was "at least a reasonable possibility that a loss or an additional loss may have been incurred." SFAS No. 5, ¶10.  A "reasonable possibility" means the chance of a future transaction or event occurring is "more than remote but less than likely," and "remote" means the chance of the future events or event occurring is slight.  *Id.* at ¶3.

---

[35]    "The term reasonably possible is used in this SOP consistent with its use in FASB Statement No. 5 to mean that the chance of a future transaction or event occurring is more than remote but less than likely."  SOP 94-6.13 (footnote in original source).

- 69 -

**Omnicare's Misstatements Were Material**

159.    Omnicare's misstatements of revenues and net income caused by Omnicare's improper accounting in the Company's 10-K405 for fiscal years 2000 and 2001, in the Company's 10-K for fiscal years 2002, 2003, and 2004, and in the Company's 10-Qs for the periods ended March 31, 2005 (1Q05), June 30, 2005 (2Q05), and September 30, 2005 (3Q05), incorporated by reference in the Prospectus, were material.  The SEC clarified the principles of materiality in SAB 99, issued in August 1999.  SAB 99 does not present new materiality standards but, instead, reaffirms long-accepted concepts expressed in auditing and accounting literature.  It also provides interpretive guidance to ensure those concepts are properly applied.

160.    Among the most important of SAB 99's points are that:

(a)    Registrants and auditors may not rely solely on quantitative criteria to evaluate an item's materiality;

(b)    The materiality of items can be determined reliably only if they are evaluated both individually and collectively; and

(c)    An intentional misstatement may be illegal even if the item it concerns is immaterial.

161.    According to SAB 99, "quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality; it cannot appropriately be used as a substitute for a full analysis of all relevant considerations.  Materiality concerns the significance of an item to users of a registrant's financial statements.  A matter is 'material' if there is substantial likelihood that a reasonable person would consider it important."

162.    In addition, SAB 99 says there are several ways in which a "quantitatively small" misstatement may be material.  For example, the misstatement may conceal a failure to meet analysts' expectations or it may convert a loss into a profit.  In fact, one of the more widespread

- 70 -

abuses that SAB 99 addresses is the intentional recording of immaterial errors in a registrant's financial statements in order to smooth earnings artificially and give a false impression of their stability. To the extent that registrants intentionally misstate immaterial items, they potentially violate provisions of the Securities Exchange Act of 1934, which mandates the use of accurate and reasonably detailed records as the basis for financial statements.

**Omnicare's Sarbanes-Oxley Certifications Were False and Misleading**

163.    Internal control[36] is a process, carried out by an entity's board of directors, management and other personnel, designed to provide reasonable assurance that, among other things, the financial statements are reliable and accurate and that a company complies with applicable laws and regulations.

164.    Management of any public company is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act.

165.    Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: "(A) make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary . . . to permit the preparation of financial statements in conformity with [GAAP]." *Id.* These provisions require an issuer to employ and supervise reliable

---

[36]    AU 319.06, *Internal Control in a Financial Statement Audit*, defines internal control as "a process – effected by an entity's board of directors, management, and other personnel – designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations." *Id.*

personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets. *SEC v. World-Wide Coin Invs., Ltd.*, 567 F. Supp. 724, 750 (N.D. Ga. 1983).

166. Omnicare senior management, and specifically defendants Gemunder and Froesel, were responsible for evaluating the Company's internal controls over financial reporting and reporting the results of their evaluation to investors in Omnicare's 10-Ks and 10-Qs. Defendants Gemunder and Froesel were also responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the Company. As part of their responsibilities, the defendants signed the following Sarbanes-Oxley certifications in the each of the 10-Qs and 10-Ks encompassing the Class Period[37] in which they (1) certified that they had performed evaluations of Omnicare's financial statements, disclosure controls and procedures, and internal controls over financial reporting and (2) certified the accuracy of Omnicare's financial statements and the effectiveness of Omnicare's disclosure controls and internal controls over financial reporting as a result of their evaluations:

I, [CEO or CFO], certify that:

1. *I have reviewed* this [annual report on Form 10-K or quarterly report on Form 10-Q]of the Company.

2. Based on my knowledge, *this report does not contain any untrue statement of a material fact* or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

---

[37] The Sarbanes-Oxley Act of 2002 (Public Law 107-204, 116 Statute 745) was enacted July 30, 2002. Specifically, the Sarbanes-Oxley certifications were signed by defendants Gemunder and Froesel in Omnicare's 10-K for the years ended December 31, 2003 and 2004, and in Omnicare's 10-Qs for the quarters ended March 31, 2005, June 30, 2005, and September 30, 2005.

3.     Based on my knowledge, ***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the Company*** as of, and for, the periods presented in this report;

\*     \*     \*

5.     The Company's other certifying officer and I have disclosed, based on ***our most recent evaluation of internal control over financial reporting***, to the Company's auditors and the audit committee of Company's board of directors:

(a)     all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, which are reasonably likely to adversely affect the Company's ability to record, process, summarize, and report financial information; and

(b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

\*     \*     \*

Date: [_____]

/s/ [_____]

*Id.*

167.     These certifications were false because Omnicare's financial statements for fiscal years 2003 and 2004, and for 1Q05, 2Q05 and 3Q05 did not "fairly present in all material respects the financial condition, results of operations, and cash flows of [Omnicare]," as alleged herein.  *See* ¶¶103-109 above (GAAP section).  This false assertion was made in the certifications pursuant to both Section 302 and Section 906 of the Sarbanes-Oxley Act, which were signed by defendants Gemunder and Froesel and included in Omnicare's 10-Ks for 2003 and 2004, and the Company's 10-Qs for 1Q05, 2Q05, and 3Q05.  Those SEC filings were incorporated by reference in Omnicare's Prospectus.

- 73 -

### THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

168.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this complaint.

169.    First, none of the statements complained of herein is a forward-looking statement. Rather they are historical statements or statements of purportedly current facts and conditions at the time the statements were made.  Second, the statutory safe harbor does not apply to statements included in financial statements which purport to have been prepared in accordance with GAAP.

170.    To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted defendants' statements regarding the Company's business and financial condition.

### CLASS ACTION ALLEGATIONS

171.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of the Class.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

172.    The members of the Class are so numerous that joinder of all members is impracticable.  Each of the securities were traded on the NYSE.  While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are at least thousands of members in the proposed Class for

each security.  Record owners and other members of the Class may be identified from records maintained by Omnicare or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

173.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

174.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

175.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)      whether the Securities Act was violated by defendants' acts as alleged herein;

(b)      whether statements made by defendants to the investing public in the Registration Statement and prospectus misrepresented material facts or omitted material facts necessary not to make the statements misleading about the business, operations and management of Omnicare; and

(c)      the extent to which the members of the Class have sustained damages and the proper measure of damages.

176.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I
### For Violation of §11 of the Securities Act
### Against All Defendants

177.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

178.     This claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.   Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based solely on theories of strict liability and negligence under the Securities Act.

179.     The Registration Statement and Prospectus were false and misleading as detailed herein, as they included misrepresentations and/or omitted to state facts necessary to make the statements made not misleading, and failed to adequately disclose material facts as described above.

180.     Omnicare is the registrant of the December 2005 Offering and filed the Registration Statement and Prospectus used in connection with the Offering.   Omnicare is the "issuer" of the common stock sold in the Offering as defined in §11 of the Securities Act. As the issuer, Omnicare is *strictly liable* for the false statements and omissions contained therein under §11 of the Securities Act.

181.     Defendants Gemunder, Froesel, Laney, Hutton and Hodges are responsible for the contents and the dissemination of the Registration Statement as they each signed the Registration Statement and participated in the preparation and dissemination of the Registration Statement by preparing, reviewing and/or signing the Registration Statement and causing their filing with the SEC.

182.     Each of the defendants named in this claim caused to be issued and participated in the issuance of materially false and misleading statements to the investing public which were contained in the Registration Statement, which misrepresented or failed to disclose, *inter alia,* the facts set forth above.

- 76 -

183.    Each of the defendants named in this claim prepared, reviewed and/or signed the Registration Statement and/or were sellers of the securities sold in the December 2005 Offering. None of these defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and did not omit any material fact and were not misleading.

184.    Plaintiffs acquired the securities pursuant and/or traceable to the Registration Statement.

185.    Plaintiffs and the Class have sustained damages.  At the time of their purchases of the securities, plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding plaintiffs and the members of the Class damages, including interest;

C.    Awarding plaintiffs reasonable costs and attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

DATED:  December 30, 2010

s/HENRY ROSEN
HENRY ROSEN
JENNIFER L. GMITRO
ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

- 77 -

590440_1

Lead Counsel for Plaintiffs

KEVIN L. MURPHY (KBA #50646)
GRAYDON HEAD & RITCHEY LLP
2400 Chamber Center Drive, Suite 300
Ft. Mitchell, KY  41017
Telephone:  859/578-3060
859/578-3061 (fax)

Liaison Counsel

590440_1